PERFECTION PAINT & COLOR CO. v. KONDURIS, SPEC. ADM.

[No. 669A101. Filed June 2, 1970. Rehearing denied September 14, 1970. Transfer dismissed and withdrawn April 28, 1971.]

*Floyd W. Burns, Douglas J. Hill, Cadick, Burns, Duck &
Neighbours,* of counsel, of Indianapolis, for appellant.

*C. Warren Holland, Howard J. DeTrude, Jr., Kightlinger,
Young, Gray & Hudson,* of counsel, of Indianapolis, for appellee.

PFAFF, J.—The plaintiff-appellee, Kosmos Alexander Konduris, instituted this action on behalf of his deceased father, Kosmos Kountouris, who died from burns inflicted in a fire in the plant of his employer, Alrimo Pizza, Inc. (Alrimo). The defendant-appellant, Perfection Paint & Color Company (Perfection), furnished Alrimo with a lacquer reducer for the purpose of removing a paint film on Alrimo's storage room floor. The lacquer reducer proved to be highly flammable and when applied to the storage room floor was ignited by an operative gas hot water heater in one corner of the storage room. This fire resulted in the death of Kosmos Kountouris.

Plaintiff-appellee's complaint contained four separate theories of recovery, (1) breach of implied warranty; (2) breach of express warranty; (3) negligence; and (4) strict liability in tort. Interrogatories to the jury disclosed that the jury found for the defendant-appellant on the first three theories, but on the fourth theory, strict liability in tort, the plaintiff-appellee was awarded the sum of $25,000.00 in damages. The jury's award of damages was based solely upon the theory of strict liability in tort as derived from 2 Restatement of Torts 2d, § 402A at 347 (1964).

In this appeal, appellant-Perfection argues that the judgment of the Marion Superior Court, Room No. 7, should be reversed by reason of the fact that the jury's verdict was

contrary to law and not supported by sufficient evidence. Appellant's motion for new trial and its argument on appeal focus upon two separate arguments in seeking a reversal of the judgment in this cause.

1. Appellant first contends that the theory of strict liability in tort, the basis of the jury's verdict, is not a recognized legal theory in this jurisdiction and that, therefore, the jury's verdict is contrary to law. This court has recently examined the legal theory of strict liability in tort and in the decision in the case of *Cornette* v. *Searjeant Metal Products, Inc.* (May 26, 1970) 147 Ind. App. 46, 258 N. E. 2d 652, the court expressly recognized and adopted the theory of strict liability in tort as embodied in § 402A, *supra*, as the law of Indiana. The statement of strict liability in tort which we adopt reads as follows:

"§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer.

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

2. Under this contention appellant asserts what it believes to be two defenses to the imposition of strict liability in tort which may, in summary, be stated as follows: (a) There was no sale of the lacquer reducer; and (b) the lacquer reducer

was misused. A recital of the facts is necessary prior to a determination of the applicability of these defenses.

The appellee's decedent, Kosmos Kountouris, was an employee of Alrimo, a corporation engaged in the pizza manufacturing business. In the late spring of 1965, Alrimo was engaged in the preparation and construction of new manufacturing facilities. Alrimo was remodeling an existing building as well as adding a new connecting structure which was to contain storage, cooler and freezer rooms. The new portions of the manufacturing facility were constructed of concrete blocks with poured concrete floors. Certain Federal regulations concerning design and construction specifications of food manufacturing facilities prescribed that the interior walls and floors of such food manufacturing facilities be covered with a highly durable, washable and chip-resistant paint.

During an early phase of construction one of appellant-Perfection's salesmen, Richard Francis, called on the job site to solicit a sale of Perfection's paint to Alrimo. As a result of this and other calls, it was agreed that Perfection was to supply the paint for Alrimo's manufacturing facility. At the time of sale, Mr. Francis was advised of the Federal standards applicable to the quality of paint to be applied to the interior walls of the building. It was suggested that Perfection's epoxy paint be used because of its hard finish and capability of withstanding repeated washings without chipping or peeling. At the time of this recommendation, however, Perfection had no prior experience in the use or application of its epoxy paint on concrete floors. Alrimo followed Perfection's advice and purchased Perfection's epoxy paint for use on the building's interior surfaces.

Subsequently Perfection delivered its epoxy paint and instructed Alrimo's employees on the proper application of the paint. The walls and ceilings of the cooler, freezer and storage rooms were painted first and Perfection's epoxy paint proved to be entirely satisfactory. However, when the epoxy

paint was applied to the concrete floors in the cooler, freezer and storage rooms it was found that the epoxy paint would not properly adhere to the floor surface and, consequently, would not dry. Appellee, Kosmos Alexander Konduris,[1] called Perfection and advised Mr. Francis of the drying problem. A Mr. Walker, a Perfection employee and its plant chemist, called at Alrimo's plant and subsequently advised that the epoxy paint applied to the floors would have to be removed. Mr. Walker advised Alrimo that Perfection would remedy the problem. Thereafter, Perfection furnished Alrimo with a paint remover manufactured by Perfection and instructed Alrimo's employees on the use of the paint remover. The paint remover was first applied in the cooler and freezer rooms and Alrimo's employees manually "scraped up" the epoxy paint. After the paint was removed, mineral spirits were used to wash away the residue. However, the use of mineral spirits did not prove to be entirely satisfactory in dissolving a film left from the application of the paint remover. Perfection then suggested that its (Perfection's) lacquer reducer be used to remove the film. Lacquer reducer was applied in the cooler and freezer rooms without incident and the floors were fully cleaned and readied for repainting. There remained, however, the preparation of the storage room floor. Again the same procedure was followed. Paint remover was applied to the floor and the film left from the application of the paint remover necessitated the application of appellant's lacquer reducer in order to remove the film. Mr. Walker examined the storage room prior to the aforesaid process, and with the exception of a gas hot water heater in one corner of the room, there was nothing in the room. Perfection again furnished the necessary removal materials and instructed Alrimo's employees on the use of said materials.

Appellee's decedent, Kosmos Kountouris, an employee of

---

1. Appellee, Kosmos Alexander Konduris, is the president of Alrimo Pizza, Inc., as well as the father and personal representative of the decedent, Kosmos Kountouris.

Alrimo, took no part in any of the prior paint removing operations in the cooler and freezer rooms, but he was to participate in removing the epoxy paint from the storage room floor. The decedent, additional employees of Alrimo, and Perfection's salesman, Mr. Francis, participated in the use of the paint remover. After stripping the epoxy paint, Mr. Francis telephoned Perfection and requested delivery of the lacquer reducer in order that the film could be removed from the floor. Perfection delivered the lacquer reducer and Mr. Francis demonstrated how to use it. He poured approximately one and one-half gallons of lacquer reducer on the floor and was spreading it when it was ignited by the gas hot water heater. The burns suffered by Kosmos Kountouris resulted in his death.

(a)  Appellant contends that § 402A, *supra,* is not applicable to this occurrence because the record fails to disclose that Perfection sold its lacquer reducer to Alrimo, and, further, that the record establishes that the lacquer reducer was furnished free of charge. The Restatement imposes liability on "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property * * *".

Appellant urges us to adopt the position that in every instance of consumer injury an actual sale of the product which produces the injury is an absolute prerequisite to imposition of strict liability. In short, it is contended that the mere "furnishing" of a product is not a sale and that Perfection's gratuitous furnishing of the lacquer reducer did not constitute a transaction capable of satisfying the alleged § 402A, *supra,* "sells" requirement.

The Restatement does not attempt to define those commercial transactions which may or may not constitute a "sale" for purposes of imposing strict liability. Rather, the Restatement Comments (see 2 Restatement of Torts 2d, § 402A at 348-358) refer in context to "a special rule applicable to

sellers of products" and emphasize that the rule of strict liability "extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate consumer". The justification for the rule of "strict liability" rests upon the premise "that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products." Section 402A, *supra,* Comment c, at 349-350. Additionally, Comment f at 350 of § 402A, *supra,* prescribes the applicability of the doctrine but does so without defining "sale" or limiting strict liability to only sales transactions.

f. *Business of Selling.* The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. * * *.

"The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. * * * The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale,

and he is not liable to a third person, or even to his buyer, in the absence of his negligence. * * *."

It is therefore apparent that the tenor of the Restatement is one of strict liability of a seller because of a special duty and responsibility placed upon a seller who has injected goods into the stream of commerce. The consuming public is to be protected and indemnified from any harm suffered as a result of a defect in a product being used as intended. The accomplishment of the Restatement's stated objectives and the protection which flows therefrom is not dependent upon a "sale". The rule is really one of liability to the seller for defective goods which the seller places in commerce. A technical and complete sales transaction, while being a common and easily recognizable commercial transaction, is not the only commercial transaction which comes within the purview of the rule of "strict liability". To limit the rule to only those situations in which there has been an actual sale would be to circumscribe the rule to such an extent that its purpose might be defeated.

In *Greeno* v. *Clark Equipment Company*, 237 F. Supp. 427 (N.D. Ind. 1965), Judge Eschbach noted that the word "sells", as interpreted by the Second Circuit Court of Appeals in *Delaney* v. *Towmotor Corp.*, 339 F. 2d 4 (2d Cir. 1964), was "merely descriptive and that the product need not be sold if it has been placed 'in the stream of commerce by other means' ". The decision of which Judge Eschbach was speaking, *Delaney* v. *Towmotor Corp., supra,* involved a situation where a fork lift truck was delivered to a consumer (T. Hogan & Sons) for demonstration and "tryout" purposes. While being used on a trial basis an overhead guard collapsed and an employee (Delaney) was injured. The defendant (Towmotor Corp.) argued that the case was one of implied warranty in which it should prevail because of the absence of a sale (it was contended that the transaction constituted a gratuitous bailment). The court found a dis-

cussion of "sale" as applicable to the principles of implied warranty to be unnecessary and instead concluded the case to be one of strict liability in tort by reason of the fact that it involved a manufacturer's solicitation and invitation to use a product. In discussing the problem of "sale", the court, at page 6 of 339 F. 2d, stated:

"We realize that the latest version of the section of the Restatement of Torts Second dealing with a manufacturer's liability, § 402A(1) (Tent. Draft No. 10, 1964), speaks of 'one who sells any product in a defective condition * * *.' But we think the Court of Appeals would regard this, as we would, as a description of the situation that has most commonly arisen rather than as a deliberate limitation of the principle to cases where the product has been sold, intentionally excluding instances where a manufacturer has placed a defective article in the stream of commerce by other means. We can see no sensible reason why Delaney's rights against Towmotor should be less extensive on the facts here than if Towmotor had first sold the hilo to its distributor, or than if it had sold the machine to Hogan, for a nominal down payment, subject to return if Hogan was not satisfied after a trial period."

A California decision, *Price* v. *Shell Oil Company,* 79 Cal. Rptr. 342 (1969), lends credence to the *Delaney* "stream of commerce" interpretation, and appropriately emphasizes that strict liability is not limited to sellers alone:

"In the light of the rationale in Greenman [Greenman *v.* Yuba Power Prods., Inc., 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P. 2d 897 (1963), the harbinger of strict liability, and one of the theory's leading decisions], we perceive that the doctrine of strict liability in tort therein enunciated is equally applicable to non-sellers and, therefore, to lessors and bailors. That doctrine, originally applied to manufacturers, has since been applied to sellers in any stage of the production and distribution of goods. [Barth *v.* B. F. Goodrich (1968), 71 Cal. Rptr. 306.] * * *.

"We do not apprehend, however, that the doctrine of strict liability depends upon whether the personal property is sold or leased in mass or large quantities. The criterion, as pointed out in the Greenman case, is whether the article or chattel *is placed on the market* knowing that it is to be used

without inspection for defects. (59 Cal. 2d at p. 62, 27 Cal. Rptr. 697, 377 P. 2d 897.) The term 'market' means 'The course of commercial activity by which the exchange of commodities is effected.' (Webster's New Internat. Dict. (3d ed. 1961). * * *.) Accordingly, we perceive with respect to lessors and bailors that the inquiry in each instance is, as delineated in Cintrone [Cintrone *v.* Hertz Truck Leasing, etc., Service (1965), 415 N.J. 434, 212 A. 2d 769] whether the lessor or bailor has put the chattel in the stream of commerce in the fashion of manufacturer or retailer."

The "stream of commerce" approach stands far apart from appellant's argument favoring a narrow interpretation of the word "sells". In attempting to refute the above-cited authorities and in support of its position, the appellant has referred us to the case of *Speyer, Inc.* v. *Humble Oil and Refining Company,* 275 F. Supp. 861 (W.D. Penn. 1967) (affirmed 403 F. 2d 766 (3d Cir. 1968)) in which application of strict liability in tort was refused. Appellant contends that strict liability was rejected because there was no sale of a gasoline pump which was allegedly defective. The pump was in fact purchased from plaintiff and then leased to the plaintiff on a free basis. Plaintiff corporation suffered severe property damage from a fire caused by gasoline which had spilled from the pump hose, but the absence of an actual sale of the pump was not the determinative factor; rather, the plaintiff's charge of strict liability was refused because the defendant was not a "seller" of gasoline pumps. At 868 of 275 F. Supp. the court stated:

"Section 402A is applicable, by its very terms, to *sellers.* * * * It is stated plainly in comment f:

'The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption.'

The evidence showed that Humble was not in the business of selling pumps. It showed, to the contrary, that the pump in question was purchased by plaintiffs from Cemico and sold, still in place, to Humble who then leased it to plaintiffs. To find Humble liable under Section 402A because it furnished the pump assembly would thus be contrary to both the law and the facts of the case."

The *Speyer* holding is consistent with our understanding of strict liability in that we view the rule as not applicable to a situation in which a non-seller[2] places goods in commerce. Similarly, there is no strict liability on the occasional seller of food or other such products who is not engaged in that activity as a part of his business. See Comment f, *supra.*

The Restatement's theory of strict liability and the authorities by which it has been developed clearly indicate that the rule of strict liability is not to be limited to only those situations in which the defective and injury-producing product has been sold. We, therefore, disagree with appellant's argument that a sale of a product constitutes a prerequisite to the imposition of strict liability in tort. Furthermore, appellant's gratuitous furnishing of the lacquer reducer to the consumer, Alrimo, constituted a transaction which easily satifies our requirement that the product be placed in the stream of commerce. In retrospect we note that Perfection recommended the use of its epoxy application on concrete floors. When the paint proved unsatisfactory, Perfection, in attempting to remedy the situation, furnished paint remover, thinner and lacquer reducer free of charge in order that all of the epoxy paint and paint film could be removed prior to repainting the floors with a more satisfactory paint. The label which we attach to this transaction, i.e., gratuitous furnishing, is not of great significance; the nature of the transaction serves as the basis of strict liability in tort and not the name by which it is called. In protecting the consumer, the rule of strict liability in tort attaches to products which are placed in the stream of commerce. Here a product was furnished in order to remedy an unforeseen problem. It was

2. The existence of a "seller" is a prerequisite to the imposition of strict liability, and the rule will apply even though a "seller" places goods in the stream of commerce by way of sale, lease, bailment, etc. The term "seller" is not exclusive; implicit in the use of the term "seller" as describing the strict liability of particular defendants, are manufacturers, and others, who, as a part of their regular business, place goods in commerce. See Comment f, *supra.*

not sold but was surely placed in the hands of a consumer. The requirement has been satisfied and the fact that there was no sale of the lacquer reducer will not bar appellee's action in strict liability in tort. Notwithstanding our approval of the "stream of commerce" approach, appellant's furnishing of the lacquer reducer was such an integral part of the original sales transaction that even if an actual sale of the product was a prerequisite to strict liability, we would be constrained to hold that this defective product was sold. In this sense, the gratuitous furnishing of the lacquer reducer is not really different from a situation in which an individual buys a product of which the whole or a part thereof is defective and the manufacturer gratuitously furnishes a new product or part in order to remedy a defect. The furnishing of a replacement part or other products in order to remedy a defect constitutes a continuing and integral part of the original sales transaction. Therefore, absent the stream of commerce interpretation, strict liability would not be defeated in this case simply because the lacquer reducer was not actually sold.

(b)   On the question of misuse of the lacquer reducer, the appellant contends that by virtue of the repeated oral warnings against smoking, "scuffling around", and the necessity for adequate ventilation given immediately prior to the time the lacquer reducer was applied to the storage room floor and, further, by virtue of the written warnings on the container of the lacquer reducer's high flammability, dangerous propensities, and the prohibition against using the lacquer reducer near an open flame, the use of the lacquer reducer in a room which contained an operative gas hot water heater (the storage room), constituted a misuse of appellant's product and a defense to strict liability in tort.

Misuse of a defective product is a defense to strict liability in tort. *Greeno* v. *Clark Equipment Company, supra; Greenman* v. *Yuba Power Prods., Inc.,* 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P. 2d 897 (1963) ; Prosser, *The Fall of the Citadel,* 50 Minn. L. Rev. 791 (1966). We concur

with Judge Eschbach's statement in *Greeno, supra,* that "[m]isuse would include such conduct otherwise labeled contributory negligence and would constitute a defense." Judge Sharp of this court correctly stated that the defense of misuse is available when the product is used "for a purpose not reasonable to the manufacturer" or when the product is used "in a manner not reasonably foreseeable for a reasonably foreseeable purpose". *Cornette* v. *Searjeant Metal Products, supra* (concurring opinion). The contributory negligence of the plaintiff in failing to discover a defect in a product or in failing to guard against the existence of a defect is not misuse of the product and is, therefore, not a defense to strict liability in tort. § 402A, *supra,* Comment n at 356. A consumer who incurs or assumes the risk of injury by virtue of his continuing use of a product after having discovered a defect or who uses a product in contravention of a legally sufficient warning, misuses the product and, in the context of the defenses of incurred risk, is subject to the defense of misuse. *Greeno* v. *Clark Equipment Company, supra;* § 402A, *supra,* comment n.

A legal description of those acts which constitute a "misuse" of a product has proven to be difficult to achieve. The problem appears to us to be one of failing to differentiate between misuse of a product which does not exhibit any defective condition until misused, or which does not appear to be defective and unreasonably dangerous, and misuse of a product when the defective and unreasonably dangerous condition is either discovered by the consumer or brought to his attention by a legally sufficient warning. While in either situation a product is being misused, the former constitutes the true category of misuse while the latter form of misuse is tantamount to the traditional concepts of incurred or assumed risk. The former, which Judge Sharp in *Cornette, supra,* previously categorized as use of a product for a purpose not reasonably foreseeable to the manufacturer "or use of the product in a manner not reasonably foreseeable for a reasonably foreseeable purpose", will apply in a situation in which a

product is used for a purpose which is unforeseeable with that for which it was manufactured, or when used for a foreseeable purpose, is subjected to an unforeseeable or overly harsh use. We again refer to *Greeno* v. *Clark Equipment Company, supra,* at 429 of 237 F. Supp., wherein it is stated:

> "Neither would contributory negligence constitute a defense, although a use different from or more strenuous than that contemplated to be safe by ordinary users/consumers, that is 'misuse' would either refute defective condition or causation."

The latter form of misuse, that which is analogous to the defenses of incurred or assumed risk, occurs when a product, being used in the manner intended by the manufacturer and for the purpose intended by the manufacturer, proves to be defective and the defect is discovered, or when a defective and unreasonably dangerous product, acknowledged to be such by a manufacturer's warnings or instructions on proper use, is used in contravention of the instructions or warnings.

Appellant's lacquer reducer is admittedly a defective and unreasonably dangerous product. Because the lacquer reducer is "more dangerous than would be contemplated by the ordinary consumer/user with the ordinary knowledge of the community as to its characteristics and uses", *Greeno* v. *Clark Equipment Company, supra,* appellant owed a duty to consumers to warn of the product's unreasonably dangerous propensities, and did so warn of the product's defective condition on the container. Using the product, however, on a concrete floor in order to remove a paint film was not a use of the product inconsistent with the use for which the lacquer reducer was manufactured. It is undisputed that subsequent to the drying problems encountered in the application of appellant's epoxy paint on the concrete floors, appellant, after declaring that it would remedy the drying problem, provided paint remover, lacquer reducer, instructions, and on the scene supervision of the paint removing operation. Not only was the use of appellant's lacquer reducer a foresee-

able use of the product, appellant furnished and expressly directed the use of its product in order to remove the paint film from the storage room floor. The use of the lacquer reducer for this purpose was unquestionably done for a reasonably foreseeable purpose inasmuch as the record establishes that the manufacturer provided the product for the express purpose of removing the paint film, gave directions as to its use, supervised the operation and, additionally, the manufacturer, by its representative, applied the product to the storage room floor immediately prior to the fire.

The question of misuse in this case is not, therefore, one of using a product for an unforeseeable purpose or overly harsh or unforeseeable use for a foreseeable purpose; rather, the question is whether or not the defective and unreasonably dangerous lacquer reducer was used in contravention of warnings and instructions on the correct use of said product.

On this point, we are again required to look to the record. The decedent, Kosmos Kountouris, did not participate in the use of paint remover and lacquer reducer when those products were used to remove paint from the cooler and freezer room floors. He was first exposed to appellant's lacquer reducer and its dangers when it was applied to the storage room floor. There is no evidence which shows that he was in fact using the product. He was no doubt about to use it in conjunction with approximately four to six other individuals who were present for the paint removing operation.

The storage room in which the fire occurred contained only the water heater at the time of the fire. Mr. Francis stated that he knew of the presence of the gas hot water heater in the storage room but that he did not know that it was operative. From four to six people, including the decedent and appellant's representative, Mr. Francis, were present in the storage room prior to the fire.

Two expert witnesses testified as to the dangerous propensities and high degree of flammability of the lacquer reducer.

It was stated that appellant's lacquer reducer, a product having a flash point of thirty-four degrees fahrenheit, should never be used in a room such as Alrimo's storage room because the room contained an operative gas heater and, under the circumstances of the use of the lacquer reducer, the storage room's ventilation was inadequate.

Mr. Francis delivered the lacquer reducer at approximately three o'clock in the afternoon on the day of the fire. Inasmuch as some of those present who were to help remove the paint film, including the decedent, had never used the product before, Mr. Francis poured some lacquer reducer on the floor and demonstrated how it was to be spread. He cautioned that the lacquer reducer was dangerous and that the door to the room had to be open so as to have more ventilation. Warnings were given to the effect that there could be no smoking or "scuffling around". He stated that the lacquer reducer would have to be spread rapidly because it would evaporate. He then poured one and one-half to two gallons of lacquer reducer on the floor and it was being spread when the fire erupted. The evidence is conflicting as to who else was spreading the lacquer reducer. Appellee, Kosmos Konduris, stated that he had begun spreading some lacquer reducer in a corner of the room opposite the water heater, and one of appellant's witnesses testified that two other individuals were also spreading the lacquer reducer.

The jury must make the determination of whether or not a defective product was misused. In this case there is evidence from which the jury could have determined that either the appellant's representative, Mr. Francis, or Alrimo misused the product. Misuse on the part of the seller is properly categorized as negligence, but even though the jury found that the appellant was not negligent, this finding does not automatically presuppose misuse on the part of the consumer. The defense of misuse will defeat strict liability in tort when a jury determines that the consumer misused the product. If the evidence is conflicting on this point, as it is

in this instance, we are not at liberty to invade the province of the jury on this question, and its determination that the lacquer reducer was not misused must stand.

For the foregoing reasons, the trial court was correct in refusing to direct a verdict in favor of the defendant-appellant and in overruling its motion for a new trial.

Judgment affirmed. Costs are to be taxed against the appellant.

Hoffman, P.J., Sharp and White, JJ., concur.

NOTE.—Reported in 258 N. E. 2d 681.