Ronald **KARCZEWSKI**, Plaintiff,

v.

**FORD MOTOR COMPANY**,
Defendant.

Civ. No. 71 H 265.

United States District Court,
N. D. Indiana,
Hammond Division.

Oct. 10, 1974.

Steve H. Tokarski, Gary, Ind., for plaintiff.

Frank J. Galvin, Jr., Hammond, Ind., for defendant.

## MEMORANDUM OPINION AND ORDER

ALLEN SHARP, District Judge.

At the conclusion of all of the evidence the defendant filed a motion for directed verdict pursuant to Rule 50(a) of the Federal Rules of Civil Procedure in writing, upon which the Court reserved ruling. On September 30, 1974 the defendant filed its motion pursuant to 50(b) of the Federal Rules of Civil Procedure. Since both of these motions raise the same issues the Court will consider them together.

On September 17, 1974, the jury returned a verdict in favor of the plaintiff and against the defendant in the sum of $10,000.00. Judgment has been entered accordingly.

Counsel for both parties have favored the Court with excellent and helpful briefs.

This case was submitted to the jury upon three possible alternative bases. They are: negligence, implied warranty, and strict liability. (Originally the plaintiff also attempted to advance on the basis of express warranty but because the evidence in the case negated any such basis the case was not submitted to the jury on express warranty.)

## MOTION FOR DIRECTED VERDICT AND J.N.O.V.

It is elementary in considering these motions the Court should not interfere with the proper constitutional function of the jury; if there is a proper basis in law and in fact for the jury's decision it should not be disturbed. All of the inferences favor that decision and the defendant here must carry a strong burden to upset the jury's verdict.

Almost 30 years ago the Supreme Court of the United States in Brady v. Southern Railroad, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943), laid down as a standard that a verdict may properly be directed when, without weighing the credibility of witnesses, there can be but one reasonable conclusion as to the verdict. When applying this standard to a Rule 50(b) post-trial motion the verdict actually reached must be contra to that one reasonable conclusion. Conversely, where there is evidence that permits more than one conclusion a directed verdict should not be granted. See Pinkowski v. Sherman Hotel, 313 F.2d 190 (7th Cir. 1963), and Berry Refining Co. v. Salemi, 353 F.2d 721 (7th Cir. 1965). (We need not trouble ourselves here with the often discussed but never fully decided question of whether *Brady* and its progeny speak to a state or federal standard in a diversity case.

Dean Harvey, in 3 Indiana Practice 370, indicates that under the present Indiana Trial Rules there is no appreciable difference. Our Court of Appeals has, however, decided that state law controls this question in a diversity case. See Etling v. Sanders, 447 F.2d 593 (7th Cir. 1971), and see also Perzinski v. Chevron Chemical Co., 503 F.2d 654 (7th Cir. 1974).

Motions for directed verdict or for judgment N.O.V. are proper only when there is a complete absence of any evidence to warrant submission to a jury. Cities Service Oil Co. v. Launey, 403 F.2d 537 (5th Cir. 1968). In this regard evidence and all inferences must be considered in the light most favorable to the party opposing directed verdict. Continental Air Lines v. Wagner Morehouse, 401 F.2d 23 (7th Cir. 1968). Some courts suggest that only evidence supporting the theories of the party opposing directed verdict may be considered. Dun & Bradstreet v. Miller, 398 F.2d 218 (5th Cir. 1968). Others suggest that directed verdict is proper only when there is a complete absence of the probative facts to support the jury verdict. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969). The fundamental idea in all this compels a Federal district trial court to exercise the greatest self-restraint in interfering with the constitutionally mandated processes of jury decision. The message is to do so only in the clearest of cases. This is manifestly not one of them.

## FACTS

The evidence most favorable to the verdict comes both from the plaintiff's and the defendant's witnesses.

In August 1969 the plaintiff purchased a 1969 Ford Mustang, Mach I. The plaintiff testified that he was influenced in this decision by advertising in the television, radio and newspaper media that "Ford has a better idea." The plaintiff purchased this automobile for $3000.00 from one Kenneth Enlow. There is testimony that the original

manufacturer's retail on this automobile was about $3600.00. It had a 428 cubic inch engine that was approximately 335 horsepower. There was an express warranty with the automobile for 24,000 miles or 24 months, whichever came first. At the time of the plaintiff's purchase the automobile had 16,000 miles. The plaintiff testified that he had driven this car approximately 2000 miles before the incident here in question and therefore, at that time the car had approximately 18,000 miles on it. There was evidence that there was a pamphlet in the car prepared by the defendant, Ford Motor Company, regarding the car's care and maintenance. That pamphlet contained provisions with regard to a warranty and was in the car when purchased by the plaintiff. About a week after the plaintiff purchased the car he went to a Ford dealer seeking to have the warranty transferred to his name. He was told by the dealer that it would cost $25.00 to make the transfer. He asked the dealer if they would inspect the car or anything to make sure that the car was still good for the warranty. The dealer advised that they wouldn't inspect it but would accept his $25.00 for the transfer of the warranty. He testified that immediately after his purchase there was no malfunctioning of the automobile and that he chose not to pay the $25.00 "because why should I pay for something that's no good." He further testified that before the day of the collision here in question on one or two occasions the car idled rapidly and he put it in neutral, shut if off and started it back up again. In both cases it operated alright.

On September 24, 1969 in Munster, Indiana the plaintiff was operating this automobile on a public street. In the middle of a block after stopping at a stop sign and making a left turn the car went out of control and started to spin around. The plaintiff tried to straighten it out and lost control of it completely. It hit a telephone pole and a tree and then bounced up. It was leaning up against a tree with the front end off of the ground when it came to rest. He attempted to brake the car before the collision but was unable to do so.

As a result of this collision the plaintiff sustained a laceration in his face, medical expenses, damage to his car and a permanent cut on his head. A photograph was displayed to the jury showing the two black eyes, the swelling in the plaintiff's head and the scar in his hairline. The plaintiff also lost some time at work. The so-called specials, including damage to personal property, in this case were in the approximate sum of $2600.00.

The plaintiff also called as an expert witness, Mr. Vucko, a mechanic-bodyman with experience working on automobiles since 1943. This automobile was taken to Mr. Vucko's shop after the collision and he made an examination of the engine and the damage to it. He also testified that the automobile was worth $2500.00 before accident and approximately four to five hundred dollars after the accident. He examined the carburetor return spring assembly of this automobile immediately after the accident and found that it was broken. His exact testimony was as follows:

"A Well, the shaft from the spring to the hook. And it was just the steel rod that was broken.

You have a coil, and then you have a rod, and then you have a hook, where it hooks into a hole on the bracket. And it returns the throttle valve when you release the accelerator."

\* \* \* \* \* \*

"Q Was there any indication that there was any metal—or that any metal would have pressed against the carburetor return spring?

A I didn't see any, no."

The question was then asked as to whether or not this expert had an opinion as to whether the carburetor return spring was broken before or after this collision. The expert testified that he had repaired thousands of automobiles

and could not recall one in the shop which was broken after an accident. He also testified that he had never seen a carburetor return spring break on a relatively new car, one year old, due to abuse. This return spring was not stretched. He testified that the function of the carburetor return spring is to return the throttle valve back to a shut position when you release the accelerator pedal. When the driver presses down on the accelerator it causes expansion. If the spring breaks while the accelerator pedal is down, generally it is more likely to stay down since it has no way of returning. He also testified that the broken spring in question was thrown in the garbage can at his garage. He testified that this spring appeared to be the original equipment on this car and that it was an essential part to the safe operation of this vehicle. He further testified that if this particular automobile accelerated out of control before the collision with the tree and post that this would be consistent with the spring having broken before the collision. He testified that when you lose the accelerator in an automobile it is almost as bad as losing the brakes.

The only witness for the defendant was James Scott, a product quality engineer, in the employ of the Ford Motor Company. Detailed drawings and an actual carburetor assembly were placed in evidence and displayed to the jury. (The jury was permitted to take all of the evidence to the jury room during deliberations.) The carburetor in question was a 4-V carburetor used in the 1969, 428, 4-V engine. It is manufactured by the Holley Corporation who provide the same to the Ford Motor Company. There is evidence that the automobile in question was manufactured by the defendant on November 15, 1968. This witness testified extensively on a so-called fail-safe system in this particular carburetor. During the course of the trial while the carburetor was being handled by the witness and plaintiff's counsel, in the presence of the jury, a spring on it apparently broke. The spring here in question is purchased by the Ford Motor Company in massive quantities but the Ford Motor Company itself engages in no testing of this particular element. Mr. Scott testified that the manufacturer engages in a testing procedure of the springs before they are delivered to the Ford Motor Company. There is no individual testing of the springs in question. He also testified that the Ford Motor Company did not make specific examinations of these springs before they were installed to detect any defects in them. Mr. Scott testified that these springs were placed in a cardboard box along the assembly line and someone on the assembly line picks up the spring and hooks it into the carburetor on each end of the bracket. On cross-examination he stated:

"Q Okay. They're just in a paper box, a carton?

A Cardboard box, yes.

Q Cardboard box. And what does he do with it?

A He picks up the spring and hooks it onto the carburetor on each end of the bracket.

Q He doesn't look at the spring to make sure it's al right, does he?

A What do you mean by 'all right'?

Q I mean, he doesn't pick it up first, examine it, and then put it in?

A No."

Mr. Scott also testified to a report made by the Ford Motor Company as a result of the investigation of this incident. The conclusions in said report was that it couldn't determine whether the spring broke before or after the collision. Mr. Scott also testified that there had been a change in the type of steel used in these springs and that it was possible that there could be defective steel in the springs. Mr. Scott also testified that the normal useful life of the spring here in question would depend upon the extent of the use of the vehicle. If the vehicle was used sparingly it could last four or five years. If

the vehicle was used quite a bit it could wear out faster. He testified that normal life of this spring would be somewhere in the range of four to five or possibly six years. He also testified that the normal life of said spring in terms of the number of miles the car had been driven would be in the range of sixty to seventy thousand miles. If normal usage was around twelve thousand miles per year the spring should last approximately five years.

It is also elementary that the verdict of the jury may be sustained if there is evidence to support any one of the three bases which the plaintiff asserted for recovery in this case. This Court heard all of the evidence and concludes that it is possible for the jury to have inferred from the facts in the case a basis for recovery under any of the three asserted.

### PROOF OF MANUFACTURE

■ During the trial and since the defendant has advanced considerable verbiage challenging proof that the defendant, Ford Motor Company, was, in fact, the manufacturer of this vehicle. As defined in Perfection Paint & Color Co. v. Konduris, 147 Ind.App. 106, 258 N.E.2d 681 (1970), the plaintiff here met his burden to prove that Ford Motor Company manufactured this Ford automobile and placed it in the stream of commerce. The jury had a solid evidentiary foundation for its findings in this regard which finding is implicit in its verdict. The burden established in Becker v. Coca Cola Bottling Works, 132 Ind.App. 390, 177 N.E.2d 759 (1961), was clearly met.

### EXPRESS WARRANTY

Also the Ford Motor Company devotes much attention to a discussion of express warranty and puts several eggs in the basket provided in Blunk v. Allis-Chalmers Manufacturing Co., 143 Ind. App. 631, 242 N.E.2d 122 (1968). *Blunk* is no salvation to Ford for at least two reasons. First, this case was not submitted on express warranty. Second, *Blunk* represents pre-strict lia-

bility case law in Indiana and for that additional reason has no application here.

### NEGLIGENCE

■ In regard to negligence there is evidence from which the jury might have properly inferred that the Ford Motor Company failed to properly test and inspect the spring in question before installing the same. There is evidence from which the jury might infer that the failure of said spring was the proximate cause of the collision in question and the resulting damage. The liability based on negligence of the failure of an automobile manufacturer to test and inspect its finished product has a most respectable history which has MacPherson v. Buick Motor Co., 217 N. Y. 382, 111 N.E. 1050 (1916), as its earliest benchmark.

### IMPLIED WARRANTY

■ In regard to implied warranty there is evidence that the useful life of this particular spring was sixty to seventy thousand miles or five years given normal usage. Even aside from any express warranties there is under the law of Indiana, a statutory implied warranty of merchantability and fitness for a particular purpose. See Ind.Ann.Stat. §§ 19–2–314 to 19–2–316 (Burns' 1964 Repl.), IC 1971, 26–1–2–314 to 26–1–2–316. There is no question that the particular purpose of a passenger automobile is to drive on the public streets and highways safely without uncontrolled and unsafe behavior. Certainly, an automobile is impliedly warranted for that purpose. This automobile had been on the public streets less than one year and for approximately 18,000 miles. The failure of this small, but essential, part of the equipment of this automobile certainly would constitute a breach of implied warranty.

■ Since there is no privity of contract requirement here between the plaintiff and defendant this plaintiff is a buyer as far as this defendant is con-

cerned with reference to this automobile. In this regard the provisions of the Indiana Uniform Commercial Code, § 19–2–315 (Burns' 1964 Repl.) are relevant and provide:

"Implied warranty—Fitness for a particular purpose.—Where the seller at the time of contracting has good reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

The term "buyer" as used in the above section is defined as "a person who buys or contracts to buy goods." [1] The term "seller" as used in the above section is defined as "a person who sells or contracts to sell goods." [2] In Woodruff v. Clark County Farm Bureau Coop. Assn, Ind.App., 286 N.E.2d 188 (1972), Judge Buchanan has provided an excellent and comprehensive analysis of these statutes and the case law interpreting them. *Woodruff* represents the last word from the Indiana Courts on this subject and is very relevant here.

In effect defendant is claiming that § 19–2–315 contains a privity requirement that the implied warranty of fitness for a particular purpose extends only to the immediate buyer of the seller and not to other buyers in the chain of product distribution.

It is without substantial dispute that the defendant qualifies as a seller and that the plaintiff qualifies as a buyer in this case.

The only further issue for determination is a legal one, namely, whether Indiana law which governs this issue requires privity between buyers and sellers to an action under § 19–2–315. On this point Filler v. Rayex Corporation, 435 F.2d 336 (7th Cir. 1970) is controlling. In *Filler* the Court found that Indiana law does not require privity between the manufacturer and the plaintiff, who was not the immediate buyer from the manufacturer, on either a theory of negligence, implied warranty or strict liability. The Court then proceeded to affirm the district court's finding that the defendant was liable for breach of an implied warranty of fitness for a particular purpose under § 19–2–315. This Court is in agreement with *Filler* and the cases cited therein that Indiana does not require privity under the circumstances of the present suit. On this same issue see J. I. Case v. Sandefur, 245 Ind. 213, 197 N.E.2d 519 (1964), and Dagley v. Armstrong Rubber Co., 344 F.2d 245 (7th Cir. 1965).

There is absolutely nothing in either Cornette v. Searjeant Metal Products, 147 Ind.App. 46, 258 N.E.2d 652 (1970), or Perfection Paint & Color Co. v. Konduris, 147 Ind.App. 106, 258 N.E.2d 681 (1970), that is contrary to the analysis made here. The reasoning and result in both cases fully support the decision here.

### DISCLAIMER

■ The Ford Motor Company further contends that the claim of the plaintiff based on implied warranty fails as a matter of law because of the written disclaimers in the 1969 Mustang Warranty Facts booklet, defendant's exhibit 7, admitted into evidence. The evidence clearly discloses that the plaintiff was never contractually bound by the contents of said book in any explicit sense. That alone would be enough to defeat the Ford Motor Company's assertion on this subject. Such disclaimers are not favored by the Indiana Courts. See Woodruff v. Clark County Farm Bureau Coop., Ind.App., 286 N.E.2d 188 (1972), and Jerry Alderman Ford Sales v. Daly, Ind.App., 294 N.E.2d 617 (1972). Some courts have held such disclaimers as void and against the public policy. See Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal.Rptr. 896, 391

---

1. Ind.Ann.Stat. § 19–2–103(1)(a) (Burns' 1964 Repl.), IC 1971, 26–1–2–103(1)(a).

2. Ind.Ann.Stat. § 19–2–103(1)(d) (Burns' 1964 Repl.)

P.2d 168 (1964), and Greenman v. Yuba Power Products, 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963). The Indiana Courts have yet to issue a square holding to that effect. Such a holding is not necessary here since this record wholly fails to support Ford's assertions on disclaimer as a matter of law.

 In this regard the pleadings and contentions in the pretrial order in this case in no sense indicate that the issue of disclaimer was raised by the defendant. The record here discloses that the disclaimer issue was first raised in this case by the Ford Motor Company in the memorandum filed in support of its motion for directed verdict made at the close of all the evidence. If the issue had been properly presented to this Court it would have had some difficulty in determining as a matter of law whether this purported disclaimer met the standard of conspicuousness carefully defined in Woodruff v. Clark County Farm Bureau Coop. Assn. This is especially true since that case compels disclaimers to be strictly construed against the sellers for reasons of public policy.

 In any event, the disclaimer defense cannot here be asserted against the claims based on negligence and strict liability.

## STRICT LIABILITY

 On the issue of strict liability there is evidence that this vehicle was defective. The defect was the spring in question which broke at an early time in the age of the automobile. There is clear evidence from which the jury could have properly inferred that this spring broke and caused the automobile to accelerate resulting in the collision and the damages sustained therefrom. See Smith v. Uniroyal, 420 F.2d 438 (7th Cir. 1970); Greeno v. Clark Equipment Co., 237 F.Supp. 427 (ND DC Ind. 1965); Cornette v. Searjeant Metal Products, Inc., 147 Ind.App. 46, 258 N. E.2d 652 (1970); and Perfection Paint & Color Co. v. Konduris, 147 Ind.App. 106, 258 N.E.2d 681 (1970). See also

Restatement 2d Torts., § 402 A, and Greenman v. Yuba Power Products, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963).

In the field of automobile products liability across the country there is an emerging proliferation of litigation and resulting court decisions. For example, see Ford Motor Co. v. Zahn, 265 F.2d 729 (8th Cir. 1959); Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal. Rptr. 896, 391 P.2d 168 (1964); Riley v. Ford Motor Co., 442 F.2d 670 (5th Cir. 1971); Reid v. Ford Motor Co., 250 Ark. 176, 465 S.W.2d 80 (1971); and Pittman v. Ford Motor Co., Fla.App., 227 So.2d 246 (1969).

This case is governed by the substantive law of Indiana and the Court believes that a recent decision of the Court of Appeals of Indiana is very closely in point as to the facts, reasoning and result here. Mamula v. Ford Motor Co., Ind.App., 275 N.E.2d 849 (1971). Also consistent with this result is the case of International Harvester Co. v. Sharoff, 202 F.2d 52 (10th Cir. 1953), which is cited with approval in Mamula, 275 N. E.2d at page 853 where Judge Buchanan states:

"In reviewing the evidence presented by Mamula, it is apparent that it is not such as would support only a single inference in favor of Ford. On the contrary, a conflict exists from which a reasonable man could justifiably infer negligence. Szabo testified that *before* the accident occurred, he lost control of the steering. An essential element for steering, to-wit, the tie rod, was found 120 feet *behind* the car. Whether this tie rod fell off first, thereby causing the accident, or whether the accident itself caused the tie rod to fall off, is not known. The same question was raised in International Harvester Co. v. Sharoff, *supra*, in which the court said:

'We are also of the view that there was sufficient evidence to take the case to the jury on whether the breaking of the parts caused the

accident or were the result of the accident.'

Mamula's expert witness, Professor Rohrback, testified that a broken tie rod could cause this type of accident, thereby dispelling speculation or conjecture, if believed by the jury. Willis Bradway testified that the tie rod was broken. Yet Ford's service representative claims to have found no visible defect."

In *Mamula* the trial court was reversed for taking the case away from the jury. As far as this Court can determine *Mamula* represents the last word from Indiana's two highest courts on automobile-products liability. All of the reasons stated in *Mamula* why the trial court there should not have taken the case away from the jury constitutes an argument here for letting the jury's verdict stand.

Therefore, the defendant's motions are hereby denied.