FRUEHAUF TRAILER DIVISION, FRUEHAUF CORPORATION *v.*
QUENTIN THORNTON AND MARY THORNTON

[No. 3-1174A193. Filed August 3, 1977. Rehearing denied October 12, 1977. Transfer denied January 9, 1978.]

*Franklin A. Morse, II, David R. Melton, Thornburg, McGill, Deahl, Harman, Carey & Murray*, of South Bend, for appellant.

*Daniel J. Harrigan, Bayliff, Harrigan, Cord & Maugans*, of Kokomo, *David L. Matthews, David L. Matthews. & Associates*, of South Bend, *Jerry J. O'Connor, O'Connor and Feldman*, of Cassopolis, Michigan, for appellees.

STATON, P.J. — A jury returned a verdict which awarded Quentin Thornton seventy-five thousand dollars for injuries that he had received when a Fruehauf tire blew out causing his semitrailer truck to overturn and burn. Mary Thornton, Quentin Thornton's wife, was awarded thirteen thousand dollars for the loss of services and consortium of her husband.

Fruehauf Corporation, manufacturer of the tire, appeals and presents these issues for our review:

(A)    Did the court err in permitting the Thorntons' case to be submitted to the jury for its consideration?

(B)    Did the court err in instructing the jury at the request of the Thorntons on the law applicable to a cause of action based upon implied warranty?

(C)    Did the court err in refusing to instruct the jury at the request of Fruehauf on the doctrine of misuse?

(D)    Did the court err in refusing to instruct the jury at the request of Fruehauf on the doctrine of incurred risk?

(E)    Did the court err in admitting the Thorntons' Exhibits 14, 15 and 16 (tire, tube and flap, respectively) into evidence?

(F)    Did the court err in refusing to grant the motion of Fruehauf for judgment on the evidence under Trial Rule 50 of the Indiana Rules of Trial Procedure?

(G)    Did the court err in permitting Mr. William Bice to testify as an expert witness on behalf of the Thorntons at the trial?

(H)    Did the court err by engaging in communications with the jury during the course of its deliberations and by refusing to again instruct the jury on the law of the case as requested by the jury, without doing so in open court and without notifying the parties and their attorneys?

(I)    Did error occur in that the jury rendered a quotient verdict with respect to the damages to be awarded to Quentin Thornton?

After reviewing the record, we conclude that the trial court did not err. We affirm.

## I.

### Proximate Cause

Fruehauf Corporation contends that Thornton did not produce evidence which would establish that the tire blow out was the sole proximate cause of his injuries; therefore, as a matter of law, the trial court committed reversible error when it submitted this cause to the jury.

Where the evidence permits only one reasonable conclusion upon the question of proximate cause, the trial court's ruling is a matter of law and not sufficiency of the evidence. *Mamula* v. *Ford Motor Co.* (1971), 150 Ind. App. 179, 275 N.E.2d 849. Ind. Rules of Procedure, Trial Rule 50(A). Fruehauf sets forth an elaborate series of arithmetic formulae and mathematical computations given by its expert at trial to support the contention that the accident sequence could not have possibly occurred as Thornton described it. However, Thornton's expert testified to his discovery of defects in the tire's workmanship which supported Quentin Thornton's testimony that the accident and damages were proximately caused by the blow out.[1] It is

---

1. The testimony of Thornton's expert witness, William H. Bice, is in pertinent parts as follows:

"A. Well, in this particular tire the turn-up heights were off center and during the flexing operation of the tire, one side of the tire was stiffer than the other side. The tire, of course, being pressed down this way, one side was free to bulge out and flex more freely than the other side was. This created a force against the ply turn-up on this side of the tire. (Indicating)

"Q. What will that do to the tire?

"A. In this particular tire, it caused the ply to dig--the ply ending to dig the other plies. The plies then began to break along this turn-up in this area right here. (Indicating).

* * *

"A. The cords began to break along this area and finally enough of them broke along here that the internal air pressure which is about, I'll say, the normal air pressure is 85 pounds per square inch--the remaining plies then could not withstand the internal air pressure and it busted the remaining cords and the inner tube blew out, and in the process it usually shatters the cords up and down this way. (Indicating) So, there is a violent explosion.

* * *

"Q. In your opinion, did it blow out before it caught fire?

"A. Oh, yes. The circumferential break is a typical type break that could only occur over a period of time.

the jury's responsibility to sort through the conflicting testimony and reach a conclusion based upon the evidence they accept as being most credible. Clearly, the jury rejected the testimony of Fruehauf's expert. This is the jury's proper role. While Fruehauf denies in its brief that it is raising a "sufficiency of the evidence" argument, it is nonetheless not within the province of this Court to determine which of two logical, but opposing, inferences the trier of fact should have drawn from the evidence. We will look only to that evidence and the reasonable inferences which support the verdict. *Wm. J. & M.S. Vesey, Inc.* v. *Hillman* (1972), 151 Ind. App. 388, 280 N.E.2d 88.

> "We do not weigh the evidence and substitute our judgment for that of the trial court or jury. Further, if there is evidence or reasonable inferences to support the verdict of the jury, we do not reverse on an assignment of the appellant that the verdict is contrary to law unless the appellant affirmatively shows that reasonable men could not have arrived at the same verdict or judgment." *New York Central Railroad Co.* v. *Cavinder* (1965), 141 Ind. App. 42, 211 N.E.2d 502.

There was evidence in the record from which the jury could have concluded that the accident was proximately caused by defects in the tire manufactured and sold by Fruehauf. We cannot say as a matter of law that reasonable men could only have arrived at a conclusion different from that reached by the jury. The trial court did not err in permitting this case to be submitted to the jury for its consideration.[2]

There is sufficient evidence in the trial record from which reasonable men could conclude that the tire manufactured by Fruehauf contained a defect which caused a blow out; that the tire was thus negligently manufactured; and that such negligence

---

"Q. In your opinion, does that constitute a defect in the manufacture of that tire?

"A. The off-center plies, that I haven't previously referred to, permitting this ply turn-up on the failure side of the tire to go higher than the other side caused the tire to be stiff, more stiff on that side which caused it to be in a flex area, and this precipitated the breakage of the--the circumferential break. The off-center ply would constitute a manufacturing defect."

2.  Freuhauf filed a written motion for judgment on evidence pursuant to Ind. Rules of Procedure, Trial Rule 50 at the close of Thorntons' case in chief and again at the close of all the evidence.

proximately caused injury to Quentin Thornton. The trial court did not err.

## II.

### Implied Warranty

The trial court instructed the jury as to the following definition of implied warranty:

"The law implies a warranty by the manufacturer to persons using its product that it is reasonably fit for the ordinary purpose for which it is intended to be used.

"If you find from a preponderance of the evidence that the product, in this case a tire, was defective or not reasonably fit to be used for its ordinary and intended purpose and that the product was properly used and that in the course of the use of the product the plaintiff was injured as a direct and natural result of the defective or unfit condition of the product, then you may find that the defendant breached the warranty which the law imposes on sellers."

In Indiana, an action for breach of warranty may be either in contract or tort, depending upon the allegations of the complaint. *Wright-Bachman, Inc.* v. *Hodnett*, (1956), 235 Ind. 307, 133 N.E.2d 713. The distinctive characteristics of each warranty action are described in *Withers* v. *Sterling Drug Inc.*, 319 F.Supp. 878, 882 (S.D. Ind. 1970) as follows:

"A suit for breach of implied warranty which sounds in contract is an action which arises out of the agreement of the parties, and only a party to the contract, one in privity with him, or one within the coverage of § 19-2-318 of Burns' Indiana Statutes Annotated (1964 repl.), may enforce the implied warranty. An action for tortious breach of implied warranty arises out of a duty fixed by the law and is independent of the will or agreement of the parties." 1 I.L.E. *Action*, § 25, p. 93.

The Thorntons allege in Count II of their complaint that Fruehauf Corporation breached an implied warranty regarding the product herein involved, namely, a Fruehauf Fleet Miler Truck Tire. Count III of the complaint alleges that the tire was in a defective condition unreasonably dangerous to the user or consumer and, as such, predicates liability on the part of Fruehauf

under the theory of strict liability in tort. Fruehauf submits that a fair reading of Count II of the complaint, together with the contentions of the Thorntons set forth in the pretrial order, compels the interpretation that Count II states a cause of action based upon tort. Accordingly, it claims that when such causes of action are set forth and alleged in the same complaint, they are duplicitous, and the trial court's instruction to the jury on both theories of recovery was prejudicial to its defense of this product's liability case.

Fruehauf's reply brief cites two cases in support of its contention that this Court has presumed prejudice where erroneous statements of law have been included in jury instructions. In *City of Evansville* v. *Cunningham* (1964), 138 Ind. App. 39, 202 N.E.2d 284, four instructions were held to be presumptively prejudicial. Two of these contained incorrect statements of the law, one was outside the scope of evidence adduced at trial, and another, which encompassed a correct principle of law, was improperly refused. In *Jenkins* v. *City of Fort Wayne* (1966), 139 Ind. App. 1, 212 N.E.2d 916, two instructions were held to be prejudicial because they included misstatements of the law. However, Fruehauf does not argue that Instruction 14 contains an erroneous statement of law or is subject to any of the other disabilities noted in the above cases. Rather, it only contends that Instruction 14 is duplicative of strict liability and asks us to presume prejudice from that fact alone. There is no support in either of the above cases or elsewhere for Fruehauf's attempt to equate an erroneous instruction with one which is duplicitous.

In *Cornette* v. *Searjeant Metal Products, Inc.* (1970), 147 Ind. App. 46, 258 N.E.2d 652, Judge Hoffman wrote "We think these principles are sound and we expressly adopt § 402A, *supra,* as the law of this State."[2] In footnote 2 of his opinion in *Cornette,* Judge Hoffman further stated that "In *Greeno* v. *Clark Equipment Co.,* 237 F.Supp. 427 (N.D. 1965), the Northern District Court of Indiana adopted § 402A. . . ." and lists a series of 7th Circuit cases. *Greeno* v. *Clark Equipment Co., supra,* compared the liabilities to which a seller is subjected under implied warranty and strict liability in the following terms:

"Without attempting an exhaustive explanation, it may fairly be said that the liability which this section would impose is hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitation through inconsistencies with express warranties." *Greeno, supra,* at 429.

The decision goes on to note that:

"It is generally recognized that implied warranty is more properly a matter of public policy beyond the power of the seller to alter unilaterally with disclaimers and inconsistent express warranties." (Citations omitted). *Greeno, supra,* at 431.

From this it reaches the following conclusion:

". . . This warranty imposed by law, irrespective of privity and based on public policy, is more aptly called 'strict liability.'" (Citations omitted). *Greeno, supra.*

Therefore, the term "strict liability" signifies the standard of culpability to which a seller will be held for breach of an implied warranty which is imposed, as a matter of public policy, to a product he sells. This liability is "strict" because it attaches even though he has "exercised all possible care in the preparation and sale of his product. . . ." RESTATEMENT, *supra,* § 402A(2)(a). This is true regardless of his relationship to the product's ultimate consumer.

"Tortious breach of implied warranty forms the theoretical basis for the strict liability rule adopted in Indiana and does not constitute a separate cause of action. The implied warranty count in the present cause, absent the element of contractual privity, must sound in tort and is, therefore, duplicitous of the strict liability count: It seeks the same remedy under a different label." (Citation omitted). *Withers, supra,* at 883.

The second paragraph of Instruction 14 conveys the same meaning as the first paragraph. It merely extends the latter's general description of implied warranty by instructing the jury to consider Fruehauf's potential liability in terms of the strict liability criteria discussed above. Since strict liability is descriptive of the sanctions imposed for breach of an implied warranty, the former is as much an extension of the latter as the second paragraph is of the first.

While not theoretically coincident, the combined effect of the two paragraphs of Instruction 14 is to achieve a singular result. The first paragraph is much too general to serve as a guide for a jury's determination of evidence. When reiterated in the second paragraph, this same principle is correctly stated within the analytical context of strict liability. The latter merely advises the jury as to the details of what it has already heard. In this sense, the first paragraph is mere surplusage.

"... Repetition to some extent in instructions is bound to occur, but that does not make them per se erroneous. It is where repetition occurs so often and so emphatically that it overly impresses the jury with some particular phase of the law or fact that it can be said that such instructions are to be condemned." *Perry v. Goss* (1970), 253 Ind. 603, 608, 255 N.E.2d 923, 926.

Fruehauf suffers no prejudice even when the first paragraph is considered to have a substantive connotation of its own. While implied warranty in tort has been superseded by strict liability, the two theories nonetheless remain closely related. An identical quantum of evidence would be required to support either action in this case. We have already determined that such a preponderance of evidence is present in the trial record.

Fruehauf claims no more than that the presence of two distinct theories of products liability in one jury instruction is *per se* prejudicial to its defense. While the trial court's combination of two theories of products liability in one instruction was error, we do not feel that it substantively affected the outcome of this case.

### III.

#### Misuse

The court refused to give the jury the following "misuse" instruction as tendered by Fruehauf:

"You are instructed that 'misuse' of the product in question is a defense to the plaintiffs cause of action based upon theories of strict liability and breach of implied warranty. The burden of proving 'misuse' by a fair preponderance of the evidence is upon the defendant.

By 'misuse', we mean a use different from or more strenuous than that contemplated to be safe by ordinary users."

Fruehauf contends that the acts and omissions of Quentin Thornton, during the period elapsing between the time the blow out occurred and the time at which the tractor-trailer combination operated by him overturned constituted a misuse of the right front tire or the steering axle of the tractor. Fruehauf submits that a sufficient evidentiary basis was established to warrant and require the issue of Mr. Thornton's misuse of the tire be submitted to the jury in accordance with the aforementioned instruction. It maintains that the acts and omission of Mr. Thornton comprising the evidentiary basis for misuse did not cause the defect, but rather proximately caused the accident. Furthermore, Fruehauf contends that it was strikingly inconsistent for the court to instruct on contributory negligence but not on misuse, particularly in light of the clear fact that the evidence supporting each of these defenses was in large measure identical. It believes that if there was evidence to support an instruction on contributory negligence, there was evidence--the same evidence--to support a misuse instruction.

The question of misuse in the context of products liability was discussed by us in *Perfection Paint & Color Co.* v. *Konduras* (1970), 147 Ind. App. 106, 118, 119, 258 N.E.2d 681, 689:

"We concur with Judge Eschbach's statement in *Greeno*, [*v. Clark Equipment Co.* (1965), 237 F.Supp. 427, 429] *supra*, that ' "[m]isuse" would include much conduct otherwise labeled contributory negligence and would constitute a defense.' Judge Sharp of this court correctly stated that the defense of misuse is available when the product is used 'for a purpose not reasonably foreseeable to the manufacturer' or when the product is used 'in a manner not reasonably foreseeable for a reasonably foreseeable purpose'. *Cornette v. Searjeant Metal Products, Inc.* [(1970), 147 Ind. App. 46, 258 N.E.2d 652] *supra* (concurring opinion). The contributory negligence of the plaintiff in failing to discover a. defect in a product or in failing to guard against the existence of a defect is not misuse of the product and is, therefore, not a defense to strict liability in tort. § 402A, *supra*, Comment n at 356. A consumer who incurs or

assumes the risk of injury by virtue of his continuing use of a product after having discovered a defect or who uses a product in contravention of a legally sufficient warning, misuses the product and, in the context of the defenses of incurred or assumed risk, is subject to the defense of misuse." (Citation omitted).

Misuse is thus part of assumption of the risk when the user has knowledge of the defect (such as when he discovers the defect or it is brought to his attention by a warning). It is premised on voluntary consent as tested by a subjective standard. See RESTATEMENT (Second) of Torts, § 496A, Comment d (1965). Contributory negligence is premised on the unreasonable conduct of the plaintiff as tested by an objective reasonable man standard (such as an unreasonable failure to discover or to guard against the existence of a defect). See RESTATEMENT, *supra,* at § 463. Since misuse involves a subjective determination of continuing conduct in the presence of a known defect, and contributory negligence presumes an objective determination of failure to find or guard against a defect when a duty to do so is present, the two concepts are mutually distinguishable. Since both concepts stand for different if somewhat related propositions, it is not inevitably the case that the same evidence will support an instruction to the jury on both theories of law.

In order to justify a misuse instruction in the context of the facts presented in this case, sufficient evidence must be present in the record to establish that Quentin Thornton voluntarily continued to drive on the defective tire after the blow out made him aware of that defect. Nothing in the trial record leads us unerringly to this conclusion. Rather, Fruehauf continues to rely on the series of mathematical formulae and computations considered above to claim that Thornton drove an excessive distance on the defective tire after it blew out, thereby putting it to a use unanticipated by its manufacturer. As we have already noted, this Court will not weigh evidence already decided by the trier of fact. *Vesey, Inc.* v. *Hillman, supra.*

Fruehauf additionally cites as error the trial court's refusal to instruct the jury as to its following tendered definition of incurred risk:

> "When a person knows of a danger, understands the risk involved and voluntarily exposes himself to such danger, that person is said to have 'incurred the risk' of injury."

The doctrine of incurred risk differs from assumption of the risk only in that the latter is predicated upon the existence of a contractual relationship while the former is non-contractual. *Pierce v. Clemens* (1943), 113 Ind. App. 65, 75, 46 N.E.2d 836, 840. As we note above, misuse is part of assumption of the risk when a user has knowledge of a defect in a product. Therefore, since no evidence is present on the record to support an instruction on misuse, there is also no evidentiary basis on which to support an instruction for incurred risk.

The trial court ruled correctly in refusing Fruehauf's tendered instructions on misuse and incurred risk.

## IV.

### Chain of Custody

Fruehauf Corporation contends that there was not sufficient evidence of probative value to establish that the tire, tube and flap offered into evidence at trial were the same tire, tube and flap purchased by Mr. Thornton in South Bend, Indiana on June 16, 1969, or that the tire, tube and flap offered into evidence at trial were the same tire, tube and flap that were on the right front steering axle of the truck driven by Mr. Thornton on August 7, 1969, the date of his accident. Fruehauf Corporation further contends that there was not sufficient evidence of probative value to establish that the tire, tube and flap were in substantially the same condition immediately prior to the accident as they were on the date of their alleged purchase on June 16, 1969, or that the tire, tube and flap at the trial were in substantially the same condition as they were at the time of the accident in question.

Briefly, the evidence consisted of Quentin Thornton testifying that on Monday, June 16, 1969, he purchased several tires in South Bend, Indiana, which he delivered to Mr. Rank, the truck's owner; that he could not state of his own knowledge that those

tires were placed on the steering axle of the truck he was scheduled to begin driving the next week; that on August 7, 1969, he was involved in an accident in Middletown, Ohio; that later the same day the truck Mr. Thornton was driving had been removed from the scene of the accident to the Artim Transportation terminal in Middletown, Ohio; and that Mr. Thornton did not witness the removal of the wreckage from the scene of the accident to the Artim terminal in Middletown, Ohio. There was no evidence regarding the location, custodian or condition of the tire from August 7, 1969 until April of 1970 when Mr. Thornton took the tire, tube, flap and rim from the abandoned wreckage. Additionally, there was no evidence introduced relating to the location, custodian or condition of the tire from April 1970 until April 20, 1971, when it was received by O. Edward Kurt and Associates in Royal Oak, Michigan for examination and testing purposes.

This Court addressed the question of the chain of custody of evidence in civil cases in *Orr* v. *Econo-Car of Indianapolis, Inc.* (1971), 150 Ind. App. 411, 422, 276 N.E.2d 524, 530, by noting that:

"We do not believe that it is necessary in a civil case to show precisely every hand through which the exhibit may have passed...."

The *Orr* decision continues by first alluding to the holding in *Graham* v. *State* (1970), 253 Ind. 525, 255 N.E.2d 652, that:

". . . it is necessary to establish a complete chain of evidence tracing the possession of the exact and original exhibit to the final custodian. If one line of the chain is entirely missing, the exhibit cannot be introduced or made the basis for the testimony or the report of an expert or officer."

*Orr, supra*, 150 Ind. App. at 422, 276 N.E.2d at 530. Although the *Orr* decision specifically refuses to apply this principle to civil cases, it is important to realize that its limited holding that the chain of custody in this particular civil case met the *Graham* criteria was made without "giving any allowance for the differing burdens which exist in criminal and civil cases. . . ." *Orr, supra*, 150 Ind. App. at 423, 424, 276 N.E.2d at 531.

The *Orr* court distinguished *Graham* by citing the following language of another criminal case, *Guthrie* v. *State* (1970), 254 Ind. 356, 260 N.E.2d 579:

"Appellee has cited several cases the holdings of which indicate that all possibility of tampering need not be excluded; upon reasonable assurance that the exhibit has passed through the various hands in an undisturbed condition its admission is proper and any remaining *doubts go to its weight only.* [citations omitted]. . . *We believe that such a rule is well grounded in logic and reason.*"

*Orr, supra,* 150 Ind. App. at 423, 276 N.E.2d at 530, 531. This principle was relied on by the trial judge in overruling Fruehauf's objection to the admission into evidence of the tire, tube and flap.

Inasmuch as the *Orr* court determined it unnecessary to distinguish between the civil and the more stringent criminal standards of evidentiary proof in its limited consideration of *Graham*, we do not feel constrained to do so with reference to *Guthrie*. We hold that the principle enunciated in the latter is equally applicable to civil cases. Therefore, in the absence of evidence of tampering, an unexplained gap in the chain of evidence alone is insufficient to bar an exhibit from being introduced into evidence. Any doubts as to its undisturbed condition go to its weight only.

In *Chrysler Corporation* v. *Alumbaugh* (1976), 168 Ind. App. 363, 342 N.E.2d 908, we considered the admissibility into evidence of an expert's conclusion as to braking tests he had performed on a pick-up truck. The truck had been out of the expert's control for approximately ten days from the time he first inspected it until the day when it was towed to his laboratory for testing. We concluded that:

"Chrysler has not asserted that the vehicle was tampered with nor does any evidence to sustain such an inference appear in the record. Neither does it appear that the braking system would be subject to any degeneration or deterioration during the brief time in question. We cannot say that the court abused its discretion by not requiring further proof in this regard before admitting the evidence." [Citation omitted]. *Chrysler, supra,* 342 N.E.2d at 920.

Although the disputed tire, tube and flap had lain in the open while attached to Thornton's wrecked truck for approximately twenty months, Fruehauf presented no countervailing evidence either as to their degeneration or as to any tampering done to them. In the absence of indicia to the contrary, we believe further

assurances from Thornton as to the authenticity of the challenged items to be unnecessary.

The trial court properly admitted the tire, tube and flap into evidence.

## V.

### Expert Testimony

A pre-trial conference was held in mid-January, 1974, at which the parties exchanged lists of witnesses and exhibits.

Pursuant to Fruehauf Corporation's request, acquiesced in by counsel for the Thorntons and approved by the court, the Thorntons designated Mr. John Gellatly as the sole expert witness to be called by them to testify at trial.

Counsel for Mr. and Mrs. Thornton were ordered to prepare the pre-trial order, which was required to be filed on or before April 22, 1974. However, it was not then prepared and filed, and, on May 15, 1974, counsel for Fruehauf prepared a proposed form of pre-trial order, which was submitted to counsel for the Thorntons on May 15, 1974. On Friday, May 17, 1974, three days before trial, counsel for both parties met to discuss matters regarding the pre-trial order. Fruehauf's proposed form of pre-trial order, listing Mr. Gellatly as the Thorntons' only expert in accordance with opposing counsels' prior designation, was not amended.

On the morning of the first day of trial, counsel for Mr. and Mrs. Thornton first sought inclusion among the list of experts to be called on behalf of their clients the name of William Bice. This was contrary to the designation of expert witnesses made at a pre-trial conference several months earlier and an important addition to the form of pre-trial order submitted by Fruehauf to opposing counsel in advance of trial.

The trial court initially ruled that, "in the interest of justice", Mr. Bice would be permitted to testify on condition that he be made available for deposition by Fruehauf at the earliest opportunity. His deposition was then taken on the evening of the opening day of trial.

16

Freuhauf objected that it had only a short and inadequate period of time within which to evaluate the somewhat different theories advanced by the new expert witness, Mr. Bice. It contends that the surprise and resultant prejudice it suffered are intended to be avoided by use of the pre-trial procedures provided for in Ind. Rules of Procedure, Trial Rule 16. Therefore, it claims that the trial court abused its discretion in allowing Bice to testify and that this constitutes reversible error.

In *North Miami Consolidated School District* v. *State ex rel. Manchester Community Schools* (1973), 261 Ind. 17, 300 N.E.2d 59, our Supreme Court considered the purpose of a pre-trial conference:

> "The express purpose of Trial Rule 16, Indiana Rules of Trial Procedure, IC 1971, 34-5-1-1, is to provide for a pre-trial conference in which to simplify the issues raised by the pleadings and to define these issues within a pre-trial order. Trial Rule 16(J) reads in pertinent part as follows:
>
> > '(J) *Pre-trial order.* The court shall make an order which recites the action taken at the conference, the amendments allowed to the pleading, and the agreements made by the parties as to any of the matters considered which limit the issues for trial to those not disposed of by admissions or agreement of counsel, *and such order when entered shall control the subsequent course of action, unless modified thereafter to prevent manifest injustice. . .'*
>
> (Emphasis added.)" 261 Ind. at 20, 300 N.E.2d at 62.

Thornton's counsel was expressly charged at the conclusion of the pre-trial hearing to prepare and submit a pre-trial order to the court for its signature and filing. However, no final pre-trial order was submitted until the actual commencement of the trial itself.[3]

3. The following statement made by Judge Beamer is especially indicative of the problems engendered by the tardy pre-trial order:

"THE COURT: One thing we are not going to do is delay the trial. I should note additionally for the record this cause was originally set for trial September 24, 1973, and the pre-trial order directed to be filed by September 18. The case was not reached for trial at that time. It was reset for trial on February 11, 1974, and the pre-trial order directed to be filed by January 31, 1974. Then because of problems in discovery, it was again continued until today's date and the pre-trial order directed to be filed by April 22, 1974, and despite those several trial

The difficulty of such a procedure was noted with particularity in *Burton* v. *Weyerhaeuser Timber Co.* (1941), 1 F.R.D. 571:

> "Pre-trial orders should be agreed on by counsel and presented to the court for signature and filing a reasonable time before trial. In the rare cases where counsel are unable to agree on the form of the pre-trial order, the court should be advised well before the trial date, and pre-trial orders representing the views of both sides submitted.
>
> * * *
>
> The attorneys were expressly charged at the conclusion of the pre-trial hearing to prepare and submit a pre-trial order not later than one week before the trial. In disregard of this direction the pre-trial order was not submitted until after the jury had been empaneled and sworn, and then only in response to a question from the bench about the order. I cannot escape the impression that there was some connection between the failure to observe the direction to prepare and to submit the pre-trial order well before the trial, and the surprise issues raised at the trial." *Burton, supra,* at 572-73.

Inasmuch as Indiana's pre-trial procedure had its inception in Federal Rule of Civil Procedure 16, this analogy is entirely appropriate to the case under consideration. See 2, Harvey, *Indiana Practice,* 176.

Since no entry of the pre-trial order was made in the trial court's record before the issue of the disputed expert arose, its terms were not binding upon either party.[4]

settings and directions to counsel with regard to the preparation and filing of a pre-trial order, it was not filed until this morning, on the morning the case was set for trial. This is the kind of difficulty, gentlemen, that is avoided by early preparation and the early filing of a pre-trial order. Now, the Court reserves its ruling on the Plaintiffs' request to present Mr. Bice as a witness in this cause, and I will expect you to report to me what progress you have made with regard to the discovery requested by the Defendant."

4. The controversy over allowing Bice to testify was apparently resolved in chambers on the morning of the trial day according to the following excerpt from the record:

"THE COURT: Have the record indicate the Court has already heard arguments of counsel in chambers with regard to this matter and indicated a desire to resolve the matter by permitting Mr. Bice to testify on condition that he would be made available prior to his testimony for deposition or for interview by counsel for the Defendant. Would you propose to make him available for that purpose, Mr. Matthews?

"MR. MATTHEWS: Yes, Your Honor."

"... the court speaks only by its record, which is its order book, *State ex rel. Taylor v. Offutt, J., etc., et al.* (1956), 235 Ind. 552, 135 N.E.2d 241, and, thus, any oral stipulations made at pre-trial conference are not binding upon the parties in the absence of a court order." *Kansas City Life Insurance Co.* v. *Bolerjack* (1970), 147 Ind. App. 629, 631, 263 N.E.2d 375, 377.

Furthermore, the court expressly reserved its ruling on the admission of Bice to testify when it accepted the pre-trial order.[5] Also, since the order was not made a part of the record for appeal purposes, we are necessarily unable to construe its exact provisions. Error alleged but not disclosed by the record is not a proper subject for review. *State* v. *Maplewood Heights Corp.* (1973), 261 Ind. 305, 306, 302 N.E.2d 782, 784.

The pre-trial order was required to be submitted approximately one month before the commencement of the trial. Rather than waiting almost an additional month to tender its proposed order, Fruehauf would have been better advised to bring this inaction to the trial court for resolution. If the Thorntons were guilty of non-compliance with the trial court's directive to prepare and submit the pre-trial order, Fruehauf was equally guilty in allowing the matter to lapse until well beyond the time in which it could be remedied. In *State v. Dwenger* (1976), 168 Ind. App. 90, 341 N.E.2d 776, 781, both parties were found to have been inexcusably dilatory in complying with a pre-trial order to exchange witness lists. Each was thereby held to have waived its right to complain of the other's delay. Fruehauf will not be heard to

---

5. The reservation of ruling on the question of witnesses was made as follows: "THE COURT: I am not going to solve that problem now. I am trying to get the pre-trial order in some sort of shape so that I can compare my preliminary instructions to it. The preliminary instructions are prepared from the pre-trial order. It makes it difficult or impossible to prepare a preliminary instruction on the issues. I have prepared one from the pleadings that is very brief, and I have no idea whether it remains accurate because I was unable to search the record to determine which issues are still in the case. That is the difficulty you present me with, Gentlemen, when the pre-trial order is not filed as it was ordered here to be filed on April 22nd. Have you any other problems with the pre-trial order?"
"MR. MATTHEWS: No, Your Honor.
"THE COURT: With those exceptions, *and reserving any ruling on the name of the tendered witnesses and proposed stipulations, is it ready to be signed and filed?*
"MR. MATTHEWS: Yes, Your Honor." (Emphasis added.)

complain of confusion at trial which its prompt action could have averted.

Bice was also allowed, over the objection of Fruehauf Corporation, to state his opinions regarding the adequacy of the tire for use on a steering axle of a semi-truck and the adequacy of warnings given by Fruehauf Corporation to the ultimate user of the product. His opinion related to the theories of defect in design and inadequacy of warnings which were different from those the Thorntons had represented in discovery and pre-trial proceedings to be the basis of their action. Although the court later reversed itself and instructed the jury to disregard that portion of Mr. Bice's testimony, Fruehauf contends that irreversible prejudice had nonetheless resulted.

The effect of a trial court's granting of a motion to strike improper testimony was considered in *State* v. *Lenox* (1968), 250 Ind. 482, 488, 489, 237 N.E.2d 248, 252, 253:

"When a motion to strike testimony is sustained and the jury is instructed to disregard an answer, any objection or error is ordinarily cured. The trial court is in better position to determine the effect of such testimony than this Court. The trial court has a wide field of discretion as to withdrawing the case from the jury. This Court will interfere only where, notwithstanding the efforts of the trial court to correct the abuse, the irregularity appears to be such as to prevent a fair trial. *N.Y. Central Ry. Co. v. Milhiser* (1952), 231 Ind. 180, 106 N.E.2d 453, 108 N.E.2d 57.

Appellant has failed to show how it was prejudiced by not having the case withdrawn from the jury. Furthermore, on this ground, any possible error was cured when the trial court gave Defendants' (Lenox and Cook) Instruction No. 15, which reads as follows:

'In considering all the evidence presented in this case in arriving at your decision, you are not to take into consideration voluntary statements made by any of the witnesses concerning sales of property made to the State of Indiana previous to the date of condemnation by the State.' "

Fruehauf has similarly failed to specifically show how it was prejudiced by the admission and subsequent withdrawal of Bice's

testimony. Also, as in *Lenox*, the trial court gave the following instruction on inadmissible evidence:

> "During the progress of the trial, certain questions have been asked of witnesses (and certain exhibits have been offered) which the court has ruled are not admissable [*sic*] into evidence. You must not concern yourselves with the reasons for the rulings since the production of evidence is strictly controlled by rules of law.

> You are not to consider exhibits or testimony which were not admitted into evidence nor are you to consider testimony to which an objection was sustained." *Court's Instruction No. 11.*

We consider this instruction to be conclusively curative of any error. The trial court correctly allowed the Thornton's expert to testify and no error was sustained by Fruehauf through the admission and subsequent striking of parts of his testimony.

## VI.

### Jury Misconduct

After being instructed on the law of the case, the jury was charged at 12:00 noon on May 30, 1974. It then proceeded to deliberate on the issue of liability for more than eight hours, exclusive of breaks for lunch and dinner. At approximately 11:15 p.m. that evening, the bailiff was advised by the foreman that the jury was hopelessly deadlocked on the issue of liability. The foreman requested the court's assistance in resolving the dilemma, which had arisen because "one person did not conceptualize the issues of what their task was in the same way the other eleven did." The bailiff recalled his conversation with the jury foreman as follows:

> "I didn't think a review of the instructions themselves would be of any use, and he agreed they wouldn't. Then he said, 'Well, if that is the case you better advise the judge we are hopelessly split.', and I said, 'Ok. I will call the judge and let you know what he says.' At that point he closes the door again. I told them — I think I said, "Continue on as best you can during the interval.' "

The conversation concluded with the foreman saying "If we can't be advised as to what issues we are to decide, we won't make any

more progress." Fruehauf contends that by advising the foreman to "continue on as best you can during the interval," the jury was simply invited to speculate on the issues to be decided by them.

The bailiff then contacted the trial judge by telephone and related the conversations he had with the foreman. They agreed that reviewing the instructions would not resolve the jury's problem. Counsel for neither party were advised of the nature of the dilemma nor of the fact of the jury's requested assistance. The only advice to counsel was that the jury was deadlocked and, accordingly, counsel should proceed to the courthouse at which time the court would "inquire." Momentarily after counsels' arrival at the courthouse, counsel and the trial judge were advised that the jury had resolved the deadlock and that a verdict would be forthcoming.

A discussion of two cases in which bailiff misconduct in the presence of juries was held to constitute reversible error is presented in *Lambert* v. *State* (1974), 159 Ind. App. 303, 306 N.E.2d 115:

"Appellant relies on *Laine v. State*(1972), [154] Ind.Ct.App. [81], [*sic*] 289 N.E.2d 141, in arguing that the bailiff's alleged conduct constitutes reversible error. However, that case is clearly distinguishable from the instant case. In *Laine*, the bailiff undertook an explanation of the various verdict forms which had been submitted to the jury. Likewise, in the recent case of *Sparks v. State* (1972), [154] Ind.Ct.App. [691], [*sic*] 290 N.E.2d 793, the bailiff advised the jury as to the meaning of the term 'disfranchisement.' In each of these cases, the bailiff became actively engaged in matters relevant to the jury's deliberations." 306 N.E.2d at 118.

We fail to see how the bailiff's gratuitous comment regarding the futility of repeating instructions to the jury could possibly have involved him in the latter's decision-making process. It is apparent that the foreman had already indicated to him that the jury had reached an impasse in its deliberations. Furthermore, Fruehauf's contention that the bailiff's advice to the foreman to "continue as best you can during the interval" invited the latter to speculate on the issues to be decided by them is hopelessly self-

serving. There is no evidence either in the transcript of the bailiff's post-trial testimony or in Fruehauf's brief which even remotely supports such reasoning.

The ultimate determination as to whether the instructions would be recapitulated lay within the discretion of the trial judge. Had the jury's resolution of its deadlock not intervened to moot the question of reinstruction, it is clear that both counsel would have had adequate opportunity to orient themselves to this new development and to present their views. Furthermore, any complaint of surprise or prejudice was automatically cured when the jury's verdict mooted the issue of reinstruction.

Fruehauf cites the following language of *Conrad* v. *Tomlinson* (1972), 258 Ind. 115, 123, 279 N.E.2d 546, 551 as requiring a reversal of the verdict:

> "It has been held that when these types of irregularities occur, harm is presumed, and if the irregularity is not adequately explained, a reversal of the judgment is required."

This statement is openly self-serving since the *Conrad* court continued by noting that:

> "However, if an explanation for the alleged misconduct is offered, and if this Court is satisfied that no harm or prejudice resulted, then the judgment of the trial court will not be disturbed." *Conrad, supra.*

The decision-making processes of juries are necessarily barred from the perusal of outsiders. Hence, the foreman's final remark that "If we can't be advised as to what issues we are to decide, we won't make any more progress" is not conclusive. All that may reasonably be inferred from his reported remarks is that one juror was disagreeing with the majority as to their proposed disposition of this case. The bailiff never physically entered the jury room nor is it clear that his comment concerning the futility of reinstruction ever reached the other eleven jurors. In the absence of more concrete evidence, we decline to find that the bailiff's assertions constituted misconduct or that any prejudice resulted from them.

## VII.

### Quotient Verdict

As revealed by the testimony of the bailiff, Joseph D. Bradley, the jury was charged at 12:00 noon on May 30, 1974 and deliberated in excess of eight-and-one-half hours, excluding the time for lunch and dinner, on the issues of liability. At approximately 11:15 p.m., the bailiff was advised the jury was deadlocked on the issue of liability. At approximately 11:30 p.m., the bailiff for the first time overheard discussions regarding the assessment of damages. The foreman suggested that each juror cast a ballot for the amount of damages to be awarded to Mrs. Thornton, which was apparently done. The bailiff overheard no discussions regarding the damages to be awarded to Mr. Thornton. At approximately 11:40 p.m., the jury had reached its verdict on the amount of damages to be awarded Mr. and Mrs. Thornton.

Fruehauf contends that in view of the careful and lengthy deliberation of the jury regarding the liability issues and in further view of the complex nature of the evidence regarding Mr. Thornton's alleged injuries, there arises a compelling inference that the amount of damages to be awarded to Mr. Thornton was arrived at by determining a quotient after each juror had cast his ballot.

A quotient verdict occurs when the jury agrees that each juror shall write down the sum he is willing to assess as damages, that the aggregate shall be divided by the number of jurors, and the result shall be the verdict. Such a procedure is misconduct of the jury and the verdict based thereon is erroneous and must be set aside. *Dunn and Another* v. *Hall* (1846), 8 Blackford 32.

In *Dunn* the Supreme Court set aside the quotient verdict of the jury on the basis of the affidavit of the constable, in whose custody the jury had been placed. The test to be applied in determining the validity of a verdict which is attacked as being a quotient verdict is whether the jury agreed beforehand to be bound by the result reached. A verdict is not objectionable as being a

quotient verdict when there was no antecedent agreement to be bound by the result, and each juror deliberately accepted the amount thus ascertained. *Guard* v. *Risk* (1858), 11 Ind. 156, *Dunn and Another* v. *Hall, supra,* at 33.

The bailiff's post-trial testimony contains the following statement:

"I heard the foreman suggest they each write down their own figure of what they thought the damages should be. I heard at least one other juror object that that was not right and they should discuss the figures before they decided on them. *I heard the foreman respond something to the effect this was only a method of getting started, of getting a starting point, and would not be the final method.* I heard no further discussion." [Emphasis provided]

There is nothing in the remainder of the bailiff's testimony to contradict this impression. Thus, the inference that the foreman invited all the jurors to propose a figure and see where that led in terms of achieving a consensus is as plausible as that suggested by Fruehauf. Under our law, this procedure was perfectly acceptable. The foreman was not asking anyone to commit himself irrevocably. He was apparently using the averaging approach to achieve a starting figure. There is no error shown.

After considering the multiple specifications of error submitted by Fruehauf, we find that the trial court ruled correctly on all contested issues.

We affirm.

Hoffman, J., concurs; Garrard, J., concurs with Opinion.

CONCURRING OPINION

GARRARD, J.—I agree the judgment should be affirmed because Fruehauf has failed to demonstrate reversible error. However, it might be helpful to amplify upon the arguments Fruehauf has presented concerning strict liability.

It appears to me that Fruehauf's position was essentially that either (a) Thornton's account of how the upset occurred was not credible; or (b) if it occurred as described then Thornton's action

in driving upon the blown out tire for the brief period involved constituted an independent or intervening cause of the upset so as to preclude liability premised upon a defect in the tire.

Alternative (a) is not viable on appeal since the jury apparently credited Thornton's account and there was probative evidence to support such a determination. Similarly, under the facts of this case the question of whether the blow out was a remote or a proximate cause of the truck upsetting was for the jury.

Fruehauf next attempts to argue in the context of instruction No. 14 given by the court that it was error to instruct the jury on both implied warranty and strict liability under § 402A of the Restatement of Torts (2nd). While under the facts it might have been harmless to omit an instruction on implied warranty, here it was clearly harmless to give the instruction.

Fruehauf also objected to the court's refusal to give a tendered instruction regarding misuse of a product.[1] The only evidence to support a contention that Thornton misused the tire related to his action in attempting to steer through the interchange *after* the blow out. Assuming *arguendo* that this may properly be considered a form of misuse, it was adequately presented to the jury by the instructions given by the court on causation. Accordingly, there was no error in refusing the instruction.

NOTE—Reported at 366 N.E.2d 21.

---

1. No error is presented on refusal to give Fruehauf's tendered instruction No. 12 regarding incurred risk since there was neither a request nor permission granted to offer more than the ten instructions permitted by Indiana Rules of Procedure, Trial Rule 51(D).