**RELIANCE INSURANCE COMPANY,**
Plaintiff-Appellee,

v.

**AL E. & C., LIMITED,**
Defendant-Appellant.

No. 75–1831.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1976.

Decided Aug. 6, 1976.

Rehearing and Rehearing En Banc
Denied Sept. 8, 1976.

Henry J. Price, Indianapolis, Ind., for defendant-appellant.

Aribert L. Young, Howard J. De Trude, Jr., Indianapolis, Ind., for plaintiff-appellee.

Before SPRECHER and TONE, Circuit Judges, and PERRY, Senior District Judge.[*]

SPRECHER, Circuit Judge.

This appeal arose from a judgment in a products liability case brought by Reliance Insurance Company (Reliance), plaintiff-appellee, as the subrogee of Cardinal Industrial Contractors (Cardinal) against AL E. & C., Limited (ALEC), defendant-appellant. The primary issues presented by defendant on appeal are whether plaintiff has standing to sue under Section 402A of the Restatement of Torts 2d, and whether the evidence submitted at trial was sufficient to sustain a jury verdict on the grounds of strict liability.

I

After carefully reviewing the record, the evidence considered in the light most favorable to the plaintiff reveals the following facts. American AirLiquide (AAL) and AL E. & C. (ALEC) are sister companies owned by L'Air Liquide, a French corporation. A.A.L. contracted with Citizens Gas Company to supply on a "turnkey" basis a liquified natural gas plant in Indianapolis. A.A.L. then hired Pittsburgh-Des Moines Steel Company (PDM) to act as general contractor for the erection of the plant, and to supply and erect the liquified natural gas storage tank. A.A.L. agreed with its sister corporation in Canada, ALEC, that ALEC would manufacture and supply the equipment needed for the liquefaction of the natural gas and certain engineering services including supervising the entire construction contract.

One of the pieces of equipment necessary to the operation of the plant which was manufactured and supplied by ALEC was a cold box. The cold box, a large structural steel enclosure containing high pressure piping and refrigeration vessels used to cool and liquify the gas, was about 65 feet by 10 feet by 12 feet, and weighed approximately 52 tons. In early 1971, PDM subcontracted the moving and erecting of the cold box to Cardinal Industrial Contractors (Cardinal), specialists in moving heavy machinery. In accordance with the terms of Article 14 of the Subcontract, Cardinal was insured by the plaintiff Reliance Insurance Co., an inland marine insurance carrier. The subcontract included provisions for the indemnification of PDM by Cardinal for acts of the subcontractor which occurred in connection with the performance of the contract and resulted in property damage or personal injury.

Around May 1971, the cold box arrived in Indianapolis, Indiana, on three flat-bed railroad cars. William Meredith, an experienced rigger, was the foreman selected by Cardinal for the task of effecting necessary lifts of the box. It should be noted here that a French-Canadian, Albert Brin' Mayer, and a Frenchman, Eugene Kaniecki, ALEC's field erection supervisor, were sent to the jobsite at Indianapolis to supervise and assist in the erection of the cold box. These men were introduced to a Cardinal supervisor, as "the people who are really running the job" and they were constantly at the jobsite.

Meredith, supervising a crew of eight, successfully lifted the cold box from the railroad car to the flat-bed truck for transportation to the jobsite and from the truck to some cribbing on the ground in preparation for its erection. Meredith utilized one and one-fourth or one and one-half inch cables in a basket hitch around each of the

[*] Senior District Judge Joseph Sam Perry, of the United States District Court for the Northern District of Illinois, is sitting by designation.

main trunnions (lifting devices) to make the lift.

Meredith testified that as he was attaching the basket hitch arrangement in preparation for the third and final lift onto the concrete foundation, a heavy set man in a white construction hat wearing a jacket and another man with a foreign accent in dress clothing stopped his rigging operations.[1] Meredith recognized the well-dressed man as the person who had been all around the truck and cold box during various construction operations. He had also seen this man constantly taking pictures of the work at the jobsite and cold box erection operations.

The heavy set man, acting as interpreter for the foreign speaking man, told Meredith that the lift could not be made with a basket hitch, but that a choker hitch should be used instead. Meredith then expressed strong reservations regarding this suggestion and said "that utilizing the choker hitch would be a tremendous mistake." The heavy set man replied "that's what the man wants."

After this conversation, the lift was topped, the rigging was changed to a choker hitch and pieces of steel plate were welded over the faces of the main lifting trunnions under the direction and supervision of the foreign speaking man. Meredith ultimately proceeded with the lift as directed by these men.

In the course of the lift, the cable on one side broke near the vicinity of the eye of the cable on the choker causing the other main cable to snap. As a result, the cold box fell and was severely damaged. The evidence clearly indicates that the use of the choker hitch upon the lifting trunnions caused the cable to shear.

On June 8, 1971, after the box had fallen and been examined by the insurance company for all parties, a meeting was held to discuss the responsibility for and manner of making repairs. At that meeting, Reliance informally agreed to pay for the repairs and two months later, after conducting addi-

tional investigations, signed a more detailed agreement for payment. Pursuant to these agreements, Reliance paid ALEC $199,-228.78, a portion of the cost of repairs.

On April 19, 1973 Reliance filed a complaint in the Marion Superior Court in Indianapolis, Indiana, seeking rescission of the contract of repair. The cause was removed to the United States District Court for the Southern District of Indiana by petition of ALEC. At that time ALEC also filed a counterclaim seeking judgment against Reliance for the remaining amount due under the contract. On August 15, 1973, Reliance filed the second count of its complaint alleging a cause of action in strict liability under Section 402A of the *Restatement of Torts* 2d. This count was ultimately tried by a jury. ALEC then filed a motion to dismiss which was denied. The jury found for the plaintiff. After the trial ALEC filed a motion for judgment NOV which was also denied. ALEC now appeals.

### II

We shall first consider the issue of plaintiff's standing to sue under Section 402A of the Restatement of Torts 2d. Defendant contends that Reliance lacked standing to sue since Cardinal's personal property was not damaged. We disagree.

Section 402A of the Restatement of Torts, 2d provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it it sold.

(2) The rule stated in Subsection (1) applies although

---

1. With regard to physical and other identifying characteristics of these two men, additional witnesses similarly describe them as ALEC's supervisors at the jobsite—Mr. Kaniecki (foreign accent, constantly taking pictures), and Mr. Brin' Mayer (heavy set).

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has 'not bought the product from or entered into any contractual relation with the seller.

Section 402A was adopted in its entirety in Indiana by *Cornette v. Searjeant Metal Products, Inc.,* 147 Ind.App. 46, 258 N.E.2d 652 (1970). *See Ayr-Way Stores, Inc. v. Chitwood,* 261 Ind. 86, 300 N.E.2d 335 (1973), *Perfection Paint & Color Co. v. Konduris,* 147 Ind.App. 106, 258 N.E.2d 681 (1970). In that case Judge Hoffman also stated:

Our reading of § 402A, supra, and numerous cases applying it, leads us to the conclusion that it should be strictly construed and narrowly applied. The limitations on imposition of the doctrine should be fully invoked, and "strict liability" applied only in those cases which fully and fairly meet the § 402A, supra, standards.

*Id.* 258 N.E.2d at 656–657.

Defendant here urges us to strictly and narrowly construe the provisions of § 402A limiting a cause of action to physical harm of one's person or property. We are not impressed with defendant's argument. Rather, we are persuaded by the reasoning of the district court regarding this point:

Even accepting the "strictly construed and narrowly applied" dictum from *Cor-*

*nette,* it is clear that Section 402A does not say it only applies to property owned by a person; it merely says his property. Thus, to read "his property" as requiring ownership would be to change the meaning of the section in such a way as to abrogate parts of the section itself as defined by the comments. This result would go far beyond the meaning of the phrase used in *Cornette* by the majority opinion. Thus, the definition of "his property" is broader than common-law ownership as advocated by the defendant.[2]

We also feel the remarks of Professor Prosser, principal draftsman of § 402A, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn.L.Rev. 791 at 817, 819, are significant:

Any user or consumer of the product, in the broadest sense of the terms, is protected by the strict liability rule. This includes not only the final purchaser, but also members of his family, his guests, his employees, his lessee, and his donee. . . . It is not necessary that the plaintiff acquire any interest in the chattel, other than the right to make a lawful use of it. · . . .

■ We believe that Reliance through Cardinal, its subrogee, had the necessary relationship to the cold box to fall within the "his property" requirement for a claim of relief under § 402A, since Cardinal was clearly a bailee of the cold box at the time

---

**2.** Comment (c), Section 402A of the Restatement Of Torts:

On whatever theory, the justification for the strict liability has been said to be that *the seller,* by marketing his product for use and consumption, *has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it*; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of

someone, and the proper persons to afford it are those who market the products. (Emphasis added.)

Comment (1), in pertinent part, provides:

In order for the rule stated in this Section to apply . . . [i]t is not . . . necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and defendant . . . Consumption includes all ultimate uses for which the product is intended . . . "User" includes those who are passively enjoying the benefit of the product . . . as well as those who are utilizing it for the purpose of doing work upon it. . . .

of the fall pursuant to its contract with PDM. The fact that Cardinal was in possession of the cold box for a specified duty was not contested at trial.

■ It is well-settled that a bailee in lawful possession of the bailor's property can recover for damage to that property. In *New York, C. & St. L. Ry. Co. v. Aver,* 106 Ind. 219, 6 N.E. 330 (1885). the court held:

> When one is in possession of property under such an arrangement that he is accountable for it, or for any injury to it in any event, such person may sue to recover for any loss or injury done the property while it is so in his possession. *In such a case the person in possession is treated as the owner, and is entitled to all the rights of an owner.* (Citations omitted, emphasis added.)

Judge Lairy wrote in *Grand Rapids and Indiana Ry. Co. v. Resur,* 186 Ind. 563, 117 N.E. 259 (1917):

> It is no doubt true that a bailee of personal property is deemed to have such a qualified ownership as will give him a right to recover for its loss or damage as against one who has wrongfully dispossessed him of the property or destroyed it. (Citations omitted.)

Although there are no Indiana cases which specifically recognize a bailee, in lawful possession of another's property, as a "consumer" or "user" within the purview of § 402A, we feel the liberal construction of the Indiana courts regarding other provisions of § 402A are most helpful. In *Perfection Paint Color Co. v. Konduris,* 147 Ind.App. 106, 258 . N.E.2d 681 (1970), the court construed "seller" to include anyone who puts a defective product into the stream of commerce. Similarly, a bystander was allowed recovery despite the liberal requirement that plaintiff must be a "user" or "consumer." *Ayr-Way Stores, Inc. v. Chitwood,* 261 Ind. 86, 300 N.E.2d 335 (1973). Thus, we are inclined to construe the "his property" requirement to include bailees.

In accordance with the reasons set out above, we conclude that Reliance had standing to prosecute this claim under § 402A.

### III

ALEC next claims that the evidence was insufficient to support a jury verdict on the basis of § 402A. Specifically, ALEC asserts that there was insufficient evidence to sustain a verdict that the cold box was defectively designed or manufactured and that even if Reliance met its burden of proof, Cardinal's relinquishment of the lift to the two foreign speaking men constituted misuse as a matter of law, thereby relieving the manufacturer, ALEC, of any liability.

We are mindful of the rule in Indiana, as elsewhere that:

> In determining whether the jury verdict is supported by sufficient evidence, it is a well settled proposition that this court neither weighs the evidence nor resolves questions of credibility of witnesses. Rather, we view only the evidence most favorable to appellee, together with all logical inferences flowing therefrom. If, from that viewpoint, there is substantial evidence of probative value to establish each material element of the cause of action, the verdict will not be disturbed.

*Rieth-Riley Construction Inc. v. McCarrell,* Ind.App., 325 N.E.2d 844, 854–855 (1975); *Hook v. National Brick Co.,* 150 F.2d 184, 187 (7th Cir. 1945), *cert. denied,* 330 U.S. 849, 67 S.Ct. 1093, 91 L.Ed. 1293 (1947); *Dudley Sports Co. v. Schmitt,* 151 Ind.App. 217, 279 N.E.2d 266 (1972). As the court indicated in *Woodburn v. Standard Forgings Corp.,* 112 F.2d 271, 273 (7th Cir. 1940), the reviewing court's concern is:

> . . . not whether there was a preponderance of the evidence in favor of plaintiff, but whether there was substantial evidence to support the verdict. And on appeal the evidence must be considered in the light most favorable to the plaintiff, who was the prevailing party before the jury.

And since the evidence cannot be weighed on appeal:

. . . the verdict of the jury will be taken as conclusive and will not be disturbed unless it is *clearly erroneous* or shows that the jury's decision was influenced by passion, prejudice or corruption. (Emphasis added.)

*Dudley Sports Co. v. Schmitt,* 151 Ind.App. 217, 279 N.E.2d 266, 273 (1972). Thus, a jury verdict will only be set aside:

. . . (1) Where the verdict is against all the evidence; (2) Where there is a total lack of evidence to sustain the verdict; and, (3) Where it is against uncontradicted evidence. (Citations omitted.)

*Smart & Perry Ford Sales, Inc. v. Weaver,* 149 Ind.App. 693, 274 N.E.2d 718, 721 (1971). With these principals in mind, we turn to the evidence presented by Reliance.

Plaintiff offered evidence to prove that the cold box was defective and unreasonably dangerous as a result of: (1) improper and inadequate instructions as to its proper lifting and (2) the defective trunnion lifting attachments of the cold box, which were designed, manufactured, assembled and placed into the stream of commerce in a defective condition.

■ A product is defective within the meaning of § 402A where the manufacturer fails to discharge a duty to warn or instruct with respect to potential dangers of the product. Section 402A of the Restatement of Torts, comment (j) provides:

In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.

It is well established in Indiana that:

. . . a product, although virtually faultless in design, material, and workmanship, may nevertheless be deemed defective so as to impose liability upon the manufacturer for physical harm resulting from its use, where the manufacturer fails to discharge a duty to warn or instruct with respect to potential dangers in the use of the product. . . . Generally, the duty to warn arises where the supplier knows or should have known of the danger involved in the use of its product, or where it is unreasonably dangerous to place the product in the hands of a user without a suitable warning.

*Nissen Trampoline v. Terre Haute First National Bank,* Ind.App., 332 N.E.2d 820, 825 (1975). The test for the necessity of warnings was outlined in *Berkebile v. Brantley Helicopter Co.,* 462 Pa. 95, 337 A.2d 893 (1975):

. . . the sole question . . . is whether the seller accompanied his product with sufficient instructions and warnings so as to make his product safe. *This is for the jury to determine. The necessity and adequacy of warnings in determining the existence of a defect can and should be considered with a view to all the evidence.* The jury should view the relative degrees of danger associated with use of the product since a greater degree of danger requires a greater degree of protection. . . .

\* \* \* \* \* \*

Where warnings or instructions are required to make a product non-defective, it is the duty of the manufacturer to provide such warnings in a form that will reach the ultimate consumer and inform of the risks and inherent limits of the product. *The duty to provide a non-defective product is non-delegable.* (Emphasis added.)

*Id.* at 902, 903.

In the instant case, the fact that ALEC did not provide Cardinal with any instruction or warnings as to the use of the cold box is not disputed. More importantly, ALEC did not deny that its field representatives, Mr. Kaniecki and Mr. Brin' Mayer instructed Meredith to use the choker hitch for the cold box lift. Finally, expert testimony clearly established that the use of the choked hitch was the proximate cause of the cable split.

■ Substantial evidence supported the jury's verdict that the product was defective under § 402A on the grounds that the manufacturer failed to discharge a duty to warn or instruct Cardinal of potential dangers in the use of its product. Further-

more, we cannot say as a matter of law that under these facts, where the manufacturer is at the place where the product is being used, has the opportunity to observe all circumstances and proceeds to give *improper and dangerous* instructions for use, Cardinal misused the product as defendant urges. This issue was presented to the jury for its determination and was resolved in the plaintiff's favor. We are not compelled to set aside the jury's determination inasmuch as it was supported by substantial evidence.

After a review of the total record, we find no reversible error. Accordingly, the judgment is affirmed.