Kent William HOFFMAN, et
al., Appellants,

v.

E.W. BLISS COMPANY, et
al., Appellees.

No. 882S320.

Supreme Court of Indiana.

May 4, 1983.

Douglas D. Church, Church, Roberts & Beerbower, Noblesville, for appellants.

Evan E. Steger, Margaret C.A. Young, Ice, Miller, Donadio & Ryan, Indianapolis, for appellee E.W. Bliss Co.

John A. Perrin, Auberry, Stanek & Perrin, Indianapolis, for appellee Rockford Safety Equipment Co.

GIVAN, Chief Justice.

This case was tried before a jury. A verdict was rendered in favor of all defendants. Appeal was taken by plaintiffs-appellants to the Court of Appeals. Pursuant to Ind.R.App.P. 15(M), this appeal is transferred to this Court.

Plaintiffs Kent and Nancy Hoffman filed suit against various defendants as a result of injuries suffered by Kent Hoffman while he was working as an employee of Regency Electronics, Inc. The defendants originally named in the suit were E.W. Bliss Company, Humston Machinery, Inc., and Rockford Safety Equipment Company. Humston Machinery was dismissed from the action by agreement of the parties prior to trial. Rockford has been dismissed from the appeal by agreement of the parties during pendency of the appeal. Thus we decide the issues only as they apply to appellants Hoffman and appellee Bliss.

The record shows the following facts. Bliss, a Michigan corporation and a division of Gulf and Western Manufacturing Company, Inc., is a manufacturer of various types of metal punch presses for use in manufacturing operations. Sometime in 1965 a Bliss punch press was sold to Regency for use in the latter's machine shop in Indianapolis. Sometime thereafter Regency contracted with Rockford, a firm specializing in designing and distributing safety equipment for use on metal working machinery, for the purchase of a package of safety equipment on the Bliss press. Oliver Daugherty, Regency's machine shop maintenance supervisor, testified he installed this package of safety equipment on the Bliss press.

The record shows metal punch presses of this type are used to punch out impressions in pieces of sheet metal. This particular press used a hydraulic power system to provide sixty (60) tons of pressure to punch the impressions in the pieces of sheet metal being processed. The basics of the mechanical operation of the press are as follows. The shape and size of the impression to be punched out are controlled by two dies. The functional area of the machine, the point of operation, is a large flat area. Two dies are attached to the press in the point of operation area. The lower die is stationary while the upper one is attached to the essential moving part of the machine, the ram. In a single operational cycle, the ram with die attached descends to smash out the desired impression and then returns to its position above the point of operation. After several cycles have been run, the pieces cut out of the production material must be removed from the point of operation to prevent misalignment of the new production material to be put in the lower die.

The press in question is manufactured with the knowledge that more than one mode of operation is possible with the machine, depending on the needs of the pur-

chaser of the press. Thus it can be equipped with different control devices with which it may be activated to cause one cycle of operation, *i.e.,* one descent of the ram to occur. It was Rockford which supplied these control devices. One such device was a foot pedal which was housed in a metal box set on the floor under the press. The operator, who sits on a stool in front of the press, simply depresses the foot pedal to cause one cycle of the operation to occur. The other means of activating the press is by simultaneous depression of two large buttons, called palm buttons, located on either side of the press. The safety advantage of the use of the palm buttons is that the operator is required to have both hands away from the point of operation in order to activate the press for a cycle of operation. Additionally the press is equipped with devices called pullbacks. The pullbacks are a pair of long metal arms with extendable cables attached to the arms and running into the body of the press. At the end of the cables are harnesses or restraints that are to be attached to the operator's hands or wrists. When the operator uses the pullbacks and activates the press for a cycle of operation, the metal arms and cables operate in such a way as to force his hands away from the point of operation as the ram descends. Whether the press is to be operated by the foot pedal or the palm buttons is controlled by means of keys set in a control box located on the right side of the press. Only by switching the pair of keys in the control box could the mode of operation of the press be changed; simultaneous operation of the press via the foot pedal and the palm buttons is impossible.

Additionally, Rockford included in its package of safety equipment and controls warning signs to be attached to the press. One such sign was attached to the control box located on the right side of the press and stated:

"WARNING

This control is *not* intended for use without point of operation devices or guards. Adequate safety equipment must be provided for operator's protection. Metal fabricating machines are very dangerous .... Maximum safety should always be exercised to prevent accidents."

A yellow plastic sign approximately four by six inches was introduced into evidence. Printed on it in large black letters was the following:

"CAUTION

Do not operate unless safety guards or devices are in place and adjusted properly."

The record shows this sign was not affixed to the press. John McAlister, Rockford's president, testified it was customary for Rockford to include this sign in the package of safety equipment with instructions to affix it to the front of the press. Oliver Daugherty testified he never saw a sign like this in the package of safety equipment.

Also included in the safety equipment package supplied by Rockford were various manuals and instruction booklets relative to installation of the equipment. These were also admitted into evidence.

The testimony taken at trial as to the precise manner in which the accident occurred is conflicting on some points. Hoffman testified he began working at Regency in its machine shop on February 23, 1976. On March 4, 1976, the day of the accident, he was assigned to work on the Bliss press for the first time. He testified he was shown how to operate the press by Bernis Thompson, Regency's "lead man" in the machine shop, whose duty it was to generally instruct employees on proper operation of the equipment in the machine shop. Hoffman testified Thompson ran one or two pieces of production material through the press and that the total amount of instruction time he received was about five minutes. He testified the press was set up to operate by using the foot pedal and not the palm buttons. Hoffman testified he was not shown how to use either the palm buttons or the pullbacks. He testified he was not given any tools with which to remove

scraps from the point of operation when it was necessary to do so and that he removed scraps with his bare right hand. Hoffman further testified he found the press was operating improperly, in that it was often necessary to hit the foot pedal two or three times to get the ram to descend. He testified he told Thompson about this problem. Thompson neither verified nor denied that Hoffman told him of this problem.

Hoffman testified that at about 2:30 P.M. that afternoon he had just punched out an impression in a piece of production material and that, as was necessary every few cycles, he reached into the point of operation beneath the ram to remove the scraps that had collected there. While his right hand was in that area and without warning or activation by him, the ram suddenly descended crushing his fingers. Most of his index finger and all of the next two fingers of his right hand were severed and his little finger was partially crushed. Hoffman testified that when the ram descended his foot was completely out of the control box housing the foot pedal.

Bernis Thompson testified he always told an employee operating the press for the first time of the use of the safety equipment incorporated into the press and that he remembered so instructing Hoffman. He admitted, however, on cross-examination, he could not recall specifically doing so with regard to Hoffman. He also testified he never had experienced any problem with the activation of cycles of operation using the foot pedal.

Terry Weddle, a Regency employee who on the day of the accident was working at the work station in the machine shop next to Hoffman, testified he was looking directly at Hoffman at the moment the ram descended on his hand. He stated at that moment Hoffman's foot was nowhere near the foot pedal.

Much testimony was taken regarding the cause of the descent of the ram. Hoffman's theory as to this cause was that the press "double tripped." Testimony showed a double trip of a press occurs when following a normal cycle of the press a second cycle occurs without warning and without any operator initiation. Raymond Brach, a Notre Dame associate professor of engineering called as an expert witness by Hoffman, testified presses of this type did sometimes double trip and explained why such action occurs. However, he admitted he inspected the press after the accident and found no evidence a double trip could have occurred. Joseph Schwalje, a professor of engineering at Pratt Institute in New York, was called as an expert witness by Bliss. He testified a single cycle, *i.e.*, a descent and return of the ram, took place over an elapsed time of six-tenths of a second. He also testified when a true double trip occurred, the second uninitiated descent of the ram occurred immediately after the ram returned to the top of the press from the prior operator initiated cycle. Schwalje testified thus the elapsed time from the beginning of the first initiated descent of the ram to the middle of the second and uninitiated descent was nine-tenths of a second. Professor Schwalje testified in his opinion it was almost impossible for an operator to be injured by a true double trip of his press because he would have too short a time, six-tenths of a second, in which to get his hand into the point of operation such that it could be struck by a second uninitiated ram descent. Schwalje further testified that based on his inspection of the press it was incapable of double tripping due to the absence of any defect in the only parts of the operating mechanism of the press that would have to be structurally defective for a double trip to occur. Schwalje conceded that due to "an act of God or something" the press could go into an uninitiated cycle that would not be *per se* a true double trip because the uninitiated cycle would not follow the initiated cycle instantaneously.

Witnesses Weddle and Larry Gibson, another Regency machine shop employee, both testified they were aware of the press having a tendency to double trip. The nature of their testimony does not make it clear whether they were speaking of a true double trip, wherein the uninitiated cycle occurs immediately after the initiated cycle,

or whether they were speaking of an uninitiated cycle that follows sometime after the initiated cycle. Weddle testified the press had malfunctioned in this way "once every thirty to fifty parts" while he was operating it. Gibson testified this malfunction had never occurred while he was operating the press but that he had seen it happen while other employees were operating the press.

Bernis Thompson testified that he never knew of the press to double trip and also that he never knew the press to fail to cycle upon a single depression of the foot pedal. Charlie Kendall, Regency's machine shop supervisor, also corroborated Thompson's testimony that the press had never double tripped and that he didn't recall any employees ever reporting any malfunctions of the press. Oliver Daugherty testified he ran the press through fifty to one hundred cycles immediately after the accident occurred and that it never double tripped, never spontaneously cycled without activation, never failed to cycle upon a single depression of the foot pedal, and that the pullbacks were in working order but also needed a slight adjustment to make them operative.

The Hoffmans' suit was brought on the authority of the case law of this jurisdiction recognizing liability of manufacturers and sellers of products for injuries caused by the placing of those products that are in a "defective condition unreasonably dangerous" in the stream of commerce. *See, e.g., Bemis Company, Inc. v. Rubush,* (1981) Ind., 427 N.E.2d 1058; *Shanks v. A.F.E. Industries, Inc.,* (1981) Ind., 416 N.E.2d 833; *Ayr-Way Stores v. Chitwood,* (1973) 261 Ind. 86, 300 N.E.2d 335. This liability is premised on § 402A of the Restatement (Second) of Torts (1965), which reads in relevant part:

"One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property . . . ."

Moreover, the Indiana Legislature has codified the basic principles of § 402A prod-ucts liability into law in I.C. § 34-4-20A-1 et seq. [Burns 1982 Supp.].

It has also been observed the so-called "strict liability" theory of products liability does not mean the manufacturer of a product is absolutely liable for any injuries suffered by the user of the product. *Conder v. Hull Lift Truck, Inc.,* (1982) Ind., 435 N.E.2d 10; *Bemis, supra; Shanks, supra; Ayr-Way Stores, supra.* "[A] manufacturer or seller is not liable for every failure of its product which results in injury and is liable only if the product contains a defective condition rendering it unreasonably dangerous." *Conder, supra,* 435 N.E.2d at 17.

■ Also, a recovery for a plaintiff in a products liability suit requires proof the product's defect was the proximate cause of his injury. *Conder, supra; Bemis, supra.*

■ In order for the plaintiff to recover, the defect can be that the product was defectively designed, defectively manufactured, or that the manufacturer failed to supply adequate warnings or instructions as to the dangers associated with its use. *Lantis v. Astec Industries, Inc.* (7th Cir. 1981), 648 F.2d 1118 (applying Indiana law); *Burton v. L.O. Smith Foundry Products Company* (7th Cir.1975), 529 F.2d 108 (applying Indiana law).

The only issue presented for our review is whether the trial court erred in giving Defendant's Final Instruction No. 8, which reads as follows:

"The manufacturer of a press, such as the defendant E.W. Bliss Company, is entitled to assume that the company using its press will adequately safeguard the press for the operation for which it is being used and will instruct its employees in the operation of the press and the need to employ the safety devices provided.

"If you find that the plaintiff was either inadequately instructed and/or failed to use available safety devices which was the proximate cause of his injury, then I instruct you that this would constitute a misuse of the equipment and be a complete defense to the allegations against E.W. Bliss Company."

Hoffman asserts this instruction misstates the law in two important respects. He first objects to that part of the first paragraph of the instruction stating "the defendant E.W. Bliss Company, is entitled to assume that the company using its press will adequately safeguard the press for the operation for which it is being used and will instruct its employees in the operation of the press . . . ." It is Hoffman's contention that this part of the instruction erroneously instructs the jury that where the manufacturer of a product sells his product to a second party employer who intends to use the product in a manufacturing type operation, the manufacturer is absolved of any duty to have manufactured or designed a safe product or to provide any warnings calculated to reach the ultimate consumer or user of the product as to potential dangers or hazards associated with its use.

Bliss' response to this argument is that the first paragraph of this instruction must be read in conjunction with Plaintiff's Final Instruction No. 4, which states:

"You are instructed that where warnings or instructions are required to make a product nondefective, it is the duty of the manufacturer to provide such warnings in a form that will reach the ultimate consumer and inform of the risk and inherent limits of the product. The duty to provide a nondefective product is nondelegable."

Bliss points out it is well-established that instructions are to be read as a whole and considered together. *See, e.g., Deckard v. Adams,* (1965) 246 Ind. 123, 203 N.E.2d 303; *State v. Totty,* (1981) Ind.App., 423 N.E.2d 637. Bliss argues if the two instructions are read together they correctly state the law with respect to the first point Hoffman raises.

Certainly the manufacturer of a product may not design or manufacture a product with a latent flaw therein but escape liability for an injury attributable to that flaw simply by selling the product to an intermediate party, such as an employer who intends to use the product in a manufacturing operation. Such a result would suggest that the lack of privity between the manufacturer and the ultimate user of the product, the employee, bars recovery by the user for injuries proximately caused by the manufacturer's assembly or production of a flawed product. This Court specifically disapproved of such reasoning even before strict liability under § 402A became the law in Indiana. *See, J.I. Case Company v. Sandefur,* (1964) 245 Ind. 213, 197 N.E.2d 519. Moreover, Comment b to § 402A states the manufacturer's liability for injuries caused by his sale of a product in "a defective condition unreasonably dangerous" lies even though "the user or consumer has not bought the product from or entered into any contractual relation with the seller." *See also, Cornette v. Searjeant Metal Products, Inc.,* (1970) 147 Ind.App. 46, 258 N.E.2d 652.

Also, it has been held that though a manufacturer may defend in a § 402A action on grounds the user assumed or incurred a known risk in using the product, "[T]he contributory negligence of the plaintiff in failing to discover a defect in a product or failing to guard against the existence of a defect is not misuse of the product and is, therefore, not a defense to strict liability in tort." *Perfection Paint and Color Company v. Konduris,* (1970) 147 Ind.App. 106, 119, 258 N.E.2d 681, 689. Comment n to § 402A states: "Contributory negligence of the plaintiff is not a defense when such negligence consists merely in failure to discover the defect in the product, or to guard against the possibility of its existence." To hold the manufacturer might escape liability for injuries caused by his defectively manufactured or designed product by selling it to an intervening employer and leaving that party with the duty to correct the defect would run counter to the spirit and intent of Comment n.

Given this state of the law, and considering both Defendant's Final Instruction No. 8 and Plaintiff's Final Instruction No. 4, we find no misstatement of the law in the charge to the jury as a whole regarding delegability of the manufacturer's duty to not produce a product with a latent manu-

facturing or design defect. The last sentence of Plaintiff's Final Instruction No. 4 clearly states the manufacturer's duty to make a nondefective product is nondelegable. Moreover, we find nothing in the challenged instruction that contradicts or conflicts with Plaintiff's Final Instruction No. 4 as to render the charge as a whole confusing to the jury.

As to the delegability of the duty to warn and instruct, we also find the two instructions taken together correctly state the law.

The two instructions read together do not serve, as Hoffman suggests, to absolve the manufacturer of any duty to warn. Rather they indicate the manufacturer does have a duty to provide warnings or instructions that will reach the ultimate consumer or user. The instructions also indicate the manufacturer has a duty to warn of potential dangers associated with the use of the product that is otherwise free from latent design or manufacturing defects only where he has some control over the manner in which the employer incorporates the product into his operation. *Shanks, supra.*

■ We hold there was no error in the giving of Defendant's Final Instruction No. 8, insofar as the delegability of the manufacturer's duty to warn either of latent manufacturing or design defects or of potential dangers associated with the product's use is concerned.

Hoffman also contends the instruction is an erroneous statement of the law, wherein it states in the second paragraph, "If you find that the plaintiff was . . . inadequately instructed . . . this would constitute misuse of the equipment and be a complete defense to the allegations against E.W. Bliss Company." It is Hoffman's contention this statement is a gross misstatement of the law insofar as the defense of misuse is concerned.

Misuse is a well-recognized defense to § 402A strict liability. *See, Latimer v. General Motors Corporation* (7th Cir.1976), 535 F.2d 1020; *American Optical Company v. Weidenhamer*, (1980) Ind.App., 404 N.E.2d 606; *Dias v. Daisy-Heddon*, (1979)

Ind.App., 390 N.E.2d 222; *Perfection Paint v. Konduris, supra.* In the *Perfection Paint v. Konduris* case the Court of Appeals correctly summarized the nature of the defense of misuse in the following language:

"[T]he defense of misuse is available when the product is used 'for a purpose not reasonably foreseeable to the manufacturer' or when the product is used 'in a manner not reasonably forseeable for a reasonably forseeable purpose.' *Cornette v. Searjeant Metal Products, supra* (concurring opinion). The contributory negligence of the plaintiff in failing to discover a defect in a product or in failing to guard against the existence of a defect is not misuse of the product and is, therefore, not a defense to strict liability in tort. § 402A, *supra*, Comment n. at 356. A consumer who incurs or assumes the risk of injury by virtue of his continuing use of a product after having discovered a defect *or who uses a product in contravention of a legally sufficient warning, misuses the product* and, in the context of the defenses of incurred or assumed risk, is subject to the defense of misuse." (Emphasis added). *Id.* 147 Ind.App. at 119, 258 N.E.2d at 689.

In the case at bar the instruction states that one can be subject to the defense of misuse even where he was "inadequately instructed." However, as the *Perfection Paint* case makes clear, it is use in a manner contrary to legally sufficient instructions that is misuse. It defies logic to hold a user has misused a product when its danger is not open and obvious and moreover no one has warned the user of the presence of a latent danger associated with the product's use.

■ We conclude the giving of Defendant's Final Instruction No. 8 was error, as it in part incorrectly states the law. However, Bliss sets forth a number of arguments by which he contends the error is not reversible error and thus the judgment of the trial court should be affirmed.

First, Bliss contends Hoffman has waived any argument with respect to this alleged error. He claims Hoffman failed to state

with the necessary specificity to the trial court the nature of his objection to the instruction. *See, New York, Chicago and St. Louis Railroad Company v. Henderson,* (1957) 237 Ind. 456, 146 N.E.2d 531.

In the record we find Hoffman's statement of his objection to Defendant's Final Instruction No. 8 articulated as follows:

"[P]laintiff's Counsel]: Judge, with respect to E.W. Bliss Number 8 instruction, that it is a mandatory instruction and it instructs without having all the elements in it and it doesn't say the sole proximate cause.

\* \* \* \* \* \*

"[P]laintiff's Counsel]: Plaintiff objects to Instruction Number 8 of E.W. Bliss Company, which the Court has indicated it will give for the following reasons: The instruction is a mandatory instruction and does not adequately state all of the law which would allow the instruction to state as follows, quote 'Then I instruct you that this would constitute a misuse of the equipment and be a complete defense to the allegations against E.W. Bliss Company.' The instruction further invades the province of the jury and inasmuch as the instruction is a mandatory instruction it fails to limit the complete defense to acts which were the sole proximate cause of the injury. The instruction, if given, should read, 'If you find the Plaintiff was either inadequately instructed and/or failed to use available safety devices which was the sole proximate cause,' and it is not so limited."

■ Hoffman's objections as stated to the trial court on this point were not as well articulated as they might have been. However, we do not find them so lacking in specificity or clarity as to invoke the principle of Trial Rule 51(C). We hold Hoffman did not waive the objection he now makes on appeal.

In *Bemis, supra,* we stated:
"In the area of products liability, based upon negligence or based upon strict liability under § 402A of the Restatement (Second) of Torts, to impress liability upon manufacturers, the defect must be hidden and not normally observable, constituting a latent danger in the use of the product. Although the manufacturer who has actual or constructive knowledge of an unobservable defect or danger is subject to liability for failure to warn of the danger, he has no duty to warn if the danger is open and obvious to all." *Id.* 427 N.E.2d at 1061.

In *Bemis* the danger was open and obvious. In the case at bar the danger of a double trip which injured Hoffman was a latent danger of which Hoffman had no warning. We conclude, therefore, the open and obvious danger rule of the *Bemis* case cannot serve to save the instruction's misstatement of law that use in the face of inadequate warnings is misuse.

■ Bliss argues that, if we find the instruction to be erroneous, the verdict of the trial court should be affirmed anyway because the error was cured by the verdict. Our courts have held, despite the erroneous giving of or refusal to give an instruction where the verdict of the jury was correct, there is no cause to reverse the case for a new trial. *See, e.g., Campbell v. City of Mishawaka,* (1981) Ind.App., 422 N.E.2d 334. To determine if the error in the giving of an instruction is cured by the verdict requires an examination of the record and the evidence to see if the verdict could have been predicated on the erroneous instruction. *Stanley v. Johnson,* (1979) Ind.App., 395 N.E.2d 863; *Joy v. Chau,* (1978) 177 Ind.App. 29, 377 N.E.2d 670.

■ If the party complaining of the instruction produced evidence supporting his position, but the jury misunderstanding the law because of their reliance on the erroneous instruction rendered a verdict adverse to the complaining party, then it cannot be said the error in the giving of the instruction was rendered harmless because the verdict was "right" or "clearly right." *See, Louisville and Southern Indiana Traction Company v. Cotner,* (1919) 71 Ind.App. 377, 125 N.E. 78; *Diffenderfer v. City of Jeffersonville,* (1917) 67 Ind.App. 10, 118 N.E. 836; *Evansville and Terre Haute Rail-*

road Company v. Hoffman, (1914) 56 Ind. App. 530, 105 N.E. 788. Where there is only a general verdict and conflicting evidence exists, it is impossible to tell what state of facts the jury believed existed. See, Louisville, etc., Tractions v. Cotner, supra. In such a case the possibility the verdict was premised on the erroneous instruction precludes application of the "error cured by the verdict" rule.

Bliss contends the open and obvious danger rule of the Bemis case precludes any recovery for Hoffman in the case at bar because Hoffman testified he was aware of dangers of the machine. He testified he knew that "the way that machine was set up you could get your hands in it." Further, when asked if the reason he took his foot off the foot pedal each time he reached into the point of operation was "because it was obvious to you what the dangers were" he answered, "Yes."

We cannot agree with Bliss that this testimony brings this case within the Bemis holding, nor does the evidence viewed as a whole. The question turns on how broadly one construes the word "danger" in the "open and obvious danger rule." Certainly we can say it was undisputed in one sense that Hoffman knew the injury-producing mechanism of the machine was an "open and obvious danger." That mechanism was clearly visible. The tremendous force with which the ram descended was apparent.

However, Hoffman's theory as to the cause of the accident was that due to some internal malfunction or defect in the operating mechanisms of the press, and the concurrent failure of Bliss to warn of this defect, the ram descended without being activated by him. It is clear that whatever this defect or malfunction was, neither Hoffman nor anyone else could see it without making the kind of inspection the user of the product in a § 402A action is not expected to have made. See, Perfection Paint v. Konduris, supra; Restatement (Second) of Torts § 402A, Comment n. Thus, under one theory the danger or defect that caused the cycle of operation to occur was not at all "open and obvious." Hoff-

man's testimony read in its entirety can be read to be an admission on his part of nothing more than that it was obvious to him there was a danger of injury if one's hand was in the point of operation when the ram for some reason descended. However, it cannot be read as an admission, nor is there any undisputed evidence in the record that it was apparent, that is, open and obvious, that an uninitiated descent of the ram could or would occur. It is one thing to excuse the manufacturer from liability for injuries caused by dangers which are open and obvious. It is quite another to excuse him from liability for injuries caused by mechanisms that due to a hidden defect cause it to operate or malfunction at a time when the user has every reason to expect it will not. A careful examination of the evidence in each case is necessary to determine whether the danger in the product is truly and entirely open and obvious.

■ In this case, given the theory of Hoffman as to the cause of the accident and the evidence he introduced to show how it could have occurred, we cannot say as a matter of law Hoffman's injury was caused by an open and obvious danger. Though Bliss produced evidence tending to show the only way the ram could have descended was by Hoffman's inadvertent tripping of the foot pedal while his hand was in the point of operation, Hoffman produced evidence tending to show the contrary, that the ram's descent was due to either a true double trip or an uninitiated spontaneous cycle of the press. Further, the evidence is undisputed that Bliss provided no warning of such a defect (which the jury could have believed existed) calculated to reach the user of the press. We cannot say the open and obvious danger rule applies so as to render harmless the error in giving Defendant's Final Instruction No. 8.

The only other argument by Bliss as to how we might regard the error in giving the instruction as cured by the verdict is that Shanks, supra, applies so as to permit Bliss to have completely delegated the duty to warn the ultimate users of the product of the dangers associated with its use to the

second party employer, Regency, who purchased it.

Such argument fails in several respects. As we have already noted, in *Shanks, supra,* the manufacturer had no control over the work space, the hiring, instruction or placement of personnel, and the manner of integration of the product into the employer's operation. We held the manufacturer's duty to warn was therefore fulfilled when he warned the employees of the employer who were responsible for receiving and setting up the product of dangers associated with the use of the product. We said:

"Because the dryer could be used as a component in a multifaceted complex such as the one created here by [the employer], to allow a jury to examine, in retrospect, the wisdom of A.F.E.'s incorporating some lights or bells into the dryer is to permit nothing more than speculation. A complex operation such as this one could have taken many forms, depending on the needs of the owner and the imagination of the designer .... The need for any warning devices, and the circumstances surrounding their use, would, of course, depend upon the operation of the whole complex, based upon the features of its design. Thus, because the dryer could be incorporated into a variety of grain handling systems, the desirability or need for such devices could be determined only *after* any given type of complex had been chosen and created." (Emphasis in original). *Id.* 416 N.E.2d at 838.

In the case at bar, however, the product is not one installed as a "component in a multifaceted operation," *Shanks, supra.* Though Regency uses many types of metal fabrication equipment, the Bliss press operates independently of all others. Moreover, Bliss can be charged with constructive knowledge of the fact that no matter who buys its press, the basics of operation are the same: the ram will descend upon triggering by the operator to smash an impression out of a piece of sheet metal. Bliss is not in a position to claim it could not be charged with awareness of a need to warn

operators of the press to keep their hands clear of the point of operation when the press cycles. In the case at bar we cannot say the evidence is undisputed that the duty to warn was completely delegable to the purchaser of the product.

In the *Shanks* case there was no evidence any manufacturing or design defect was causally related to the accident. We noted, "[B]oth parties acknowledge that the dryer operated exactly as it was intended to operate by A.F.E. and [the employer]." *Id.,* 416 N.E.2d at 837. But in the case at bar Hoffman alleged and offered some evidence to prove the press did not operate as either Regency or Bliss intended, in that the press cycled without initiation by Hoffman, proximately causing his injuries.

It is clear the manufacturer can never delegate to a second party the duty to warn of the presence of a latent defect and the potential danger in use of the product should the defect become effectively operable. *Reliance Insurance v. AL E & C., Limited* (7th Cir.1976), 539 F.2d 1101. Thus, whatever may be said about the delegability of Bliss' duty to warn about dangers associated with the use of the product when the product functioned properly, in the case at bar where there is evidence the danger associated with the use of the product is due to the presence of a latent structural defect in the product it cannot be said the manufacturer could delegate its warning duties to any other party.

In summary, Hoffman produced sufficient evidence for the jury to have believed the press was defective in manufacture or design, and that such flaw caused an uninitiated cycle of operation to occur. The duty to warn of the fact of the defective manufacture or design was nondelegable by Bliss. *Reliance Insurance v. AL E, etc., supra.* Moreover he produced sufficient evidence to warrant a jury finding he had no warning from any source as to the propensity of the press to cycle without operator initiation. But the jury, relying on the instruction that they could find he misused the product despite the inadequacy of any warning could have been led to find a complete defense

for Bliss. Thus we conclude the jury could have rendered its verdict predicated on an erroneous understanding of the law as communicated to them through the improper instruction. *Stanley v. Johnson, supra; Joy v. Chau, supra.*

For the foregoing reasons we hold appellant, Kent Hoffman, was prejudiced by the giving of the erroneous instruction to the jury regarding the defense of misuse. The cause is remanded to the trial court for a new trial in accordance with this opinion.

Reversed and remanded.

PRENTICE and PIVARNIK, JJ., concur.

HUNTER, J., concurs in result with separate opinion in which DeBRULER, J., concurs.

HUNTER, Justice, concurring in result.

I concur in the result of this case and with the Court's conclusion that the giving of defendant's Final Instruction No. 8 was reversible error because it misstates the law on the defense of misuse. I also agree that a manufacturer cannot delegate its duty to produce a nondefective product by assuming that an intervening employer will correct the defect. To allow a delegation of the duty to warn of latent manufacture or design dangers goes against the expressed policy of Restatement (Second) of Torts, § 402A, which rests on the twin propositions that:

> "(1) the manufacturer of a product sold on the open market undertakes and assumes a responsibility to the public to produce a reasonably safe product; and (2) the public justifiably relies on the expertise of the manufacturer in its expectation that the product is designed to afford reasonable safety in its foreseeable and intended uses." *Bemis Co., Inc. v. Rubush,* (1981) Ind., 427 N.E.2d 1058, 1067 (Hunter, J., dissenting) (citing Restatement [Second] of torts, § 402A, Comment *c*).

Thus the basic premise of Section 402A is that primary responsibility for making products safe for their reasonably foreseeable use lies with the manufacturer. *Bemis,* *supra,* at 1068. Because the manufacturer is in the best position to know and warn of hidden dangers, it is his responsibility to provide sufficient warnings to make the product as safe as reasonably possible. *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank,* (1975) Ind.App., 332 N.E.2d 820, *rev'd on other grounds,* (1977) 265 Ind. 457, 358 N.E.2d 974.

Similarly, a manufacturer should not always be excused from liability because a danger is labeled open and obvious. The duty to make a product safe for its reasonably foreseeable and intended use, *i.e.,* not in "a defective condition unreasonably dangerous," still exists when the dangers are patent. The open and obvious rule, however, provides that if a danger is patent it cannot be unreasonably dangerous. This rule ignores the fact that the test is whether the danger is within the contemplation of the ultimate consumer. The product must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics" in order to be actionable under Section 402A. *Bemis Co., Inc. v. Rubush, supra,* at 1061; Restatement (Second) of Torts, § 402A, Comment *i*. Under this test, a consumer may reasonably contemplate that a manufacturer will provide feasible safety devices for foreseeable mishaps. *Gilbert v. Stone City Construction Co., Inc.,* (1976) 171 Ind.App. 418, 357 N.E.2d 738. As stated in 2 Harper & James, THE LAW OF TORTS § 28.5 p. 1543 (1956):

> "[I]f it would be feasible for the maker of the product to install a guard or a safety release, it should be a question for the jury whether reasonable care demanded such a precaution, though its absence is obvious."

Furthermore, obvious dangers are not necessarily appreciated dangers to the user.

To excuse a manufacturer from liability because it has managed to make the dangers open and obvious, without considering whether the danger is reasonable and within the contemplation of the ordinary user,

does away with the safety incentive rationale of strict liability in tort under Section 402A.

"Whereas Section 402A has universally been interpreted to require manufacturers to avoid latent dangers, they are nonetheless told all they need do to escape liability is to make those dangers patent. It is to say that a manufacturer should refrain from installing protective guards on a product, for those guards might only serve to make the danger less 'open and obvious.' The rule ignores the focus of Section 402A—whether the manufacturer, without impairing the functional capacities of the product and with *reasonable* additional costs—could have rendered the product reasonably safe. The rule, in short, as many jurisdictions have expressly recognized, encourages misdesign in its obvious form." *Bemis, supra,* at 1069 (Hunter, J., dissenting). *See, Bexiga v. Havir Mfg. Co.,* (1972) 60 N.J. 402, 290 A.2d 281; *Micallef v. Miehle Co.,* (1976) 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571; *Palmer v. Massey-Ferguson, Inc.,* (1970) 3 Wash.App. 508, 476 P.2d 713.

The better practice is to consider an open and obvious danger as but one factor when determining whether a product is dangerous beyond the contemplation of the ultimate consumer. Because Indiana has adopted the open and obvious rule, however, I agree that the rule should be narrowly construed and the evidence carefully examined in each case to determine "whether the danger in the product is truly and entirely open and obvious," *Majority Opinion*—in other words, whether the danger presented was within the ordinary user's contemplation.

DeBRULER, J., concurs.